**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| : | Case No. 14-CV-02392 (AKH) |
| : | |
| : | |
| IN RE GENWORTH FINANCIAL, INC. : | JURY TRIAL DEMANDED |
| SECURITIES LITIGATION : | |
| : | |
| : | CLASS ACTION |
| : | |
| : | |
| : | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**LABATON SUCHAROW LLP**
Jonathan Gardner
Paul J. Scarlato
Angelina Nguyen
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
Douglas R. Britton
Ashley M. Price
655 West Broadway, Suite 1900
San Diego, California 92101-8498
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Lead Counsel for the Class*

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ......................................................................... 1

II.     JURISDICTION AND VENUE .................................................................... 10

III.    PARTIES ...................................................................................................... 11

IV.     CONTROL PERSON ALLEGATIONS......................................................... 12

V.      SUBSTANTIVE ALLEGATIONS ............................................................... 15

        A.    The Company and its Business.................................................... 15

        B.    Genworth Announces the Australian IPO and Emphasizes its Importance
              Throughout the Class Period......................................................... 16

        C.    Defendants Create a Misleading Impression of Financial Stability for the
              IPO ............................................................................................... 18

        D.    Defendants' Purportedly Robust Risk Management Procedures Bolster
              their Misrepresentations................................................................ 19

        E.    Contrary to Defendants' Misrepresentations, Claims and Delinquencies
              Increase Sharply During the Class Period, Exceeding Reserves ......... 21

        F.    Genworth's False Financial Reporting During The Class Period......... 26

        G.    Defendants' Post-Class Period Admissions.................................... 30

VI.     DEFENDANTS' MATERIALLY  FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS ..................................................................................... 33

        A.    Class Period Financials................................................................ 33

        B.    November 4, 2011 3Q 11 Earnings Call....................................... 34

        C.    February 2, 2012 Form 8-K attaching February 2, 2012 Press Release ......... 36

        D.    February 3, 2012 4Q 11 Earnings Call ......................................... 36

        E.    February 27, 2012 FY 11 Form 10-K ........................................... 38

        F.    February 3, 2012 Business Goals and Focus Areas Call ..................... 39

        G.    March 29, 2012 JP Morgan Insurance Conference.......................... 40

VII.    THE TRUTH IS REVEALED..................................................................... 42

i

VIII.    CLASS ACTION ALLEGATIONS ................................................................. 47

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE  UNDER THE
       AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE
       FRAUD ON THE MARKET DOCTRINE ..................................................... 49

X.    NO SAFE HARBOR ....................................................................................... 51

XI.    LOSS CAUSATION/ECONOMIC LOSS ....................................................... 52

COUNT I  Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b)
       Promulgated Thereunder Against All Defendants ............................................ 53

COUNT II  Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c)
       Promulgated Thereunder Against All Defendants ............................................ 56

COUNT III  Violation Of Section 20(a) Of The Exchange Act Against the Individual
       Defendants ........................................................................................................ 58

JURY TRIAL DEMANDED ...................................................................................... 59

Lead Plaintiffs City of Hialeah Employees' Retirement System ("Hialeah") and New Bedford Contributory Retirement System ("New Bedford") (collectively, "Plaintiffs"), by their undersigned attorneys, hereby bring this Second Amended Class Action Complaint ("Complaint") against Genworth Financial, Inc. ("Genworth" or the "Company"), Michael D. Fraizer ("Fraizer") and Martin P. Klein ("Klein"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of their counsel, which included interviews of former employees of Genworth and other persons with knowledge of the matters alleged herein; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.),[1] and review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by Genworth, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

I.    **NATURE OF THE ACTION**

1.    This action is brought on behalf of a class of purchasers of Genworth's securities between November 3, 2011 and April 17, 2012 inclusive (the purchasers being the "Class" and the time frame being the "Class Period"). Plaintiffs seek remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

---

[1]    All CWs will be described in the masculine to protect their identities.

2.      Genworth is a financial security company engaged in providing insurance, wealth management, investment and financial solutions to more than 15 million customers, with a presence in more than 25 countries. These life security products and services include payment protection coverages in Europe, Canada and Mexico, and in the United States, life insurance products, as well as care coordination and wellness services.

3.      Genworth also is a leading provider of mortgage insurance products in Canada, Australia, Mexico and multiple European countries.   Within this International Mortgage Insurance segment, the Company's products predominantly insure prime-based, individually underwritten residential mortgage loans, also known as flow mortgage insurance.  For the year ended December 31, 2011, the segment's net income available and net operating income available to Genworth's common stockholders were $357 million and $332 million,[2] respectively.

4.      Genworth's businesses in Canada and Australia historically had generated strong margins and consistent earnings in the years prior and up to the Class Period, and were viewed as the Company's highest return businesses (in contrast, the US Mortgage Insurance business, which had been operating at a loss for years, recorded a net operating loss of $507 million for 2011).  Indeed, the Australian mortgage insurance ("MI") unit *never* had reported an operating loss prior to the April 17, 2012 announcement.

5.      Because Genworth acts as a holding company for its subsidiaries and does not have any significant operations of its own, it depends on dividends from its subsidiaries and payments under tax sharing arrangements with its subsidiaries as its principal sources of cash for operating expenses, and interest and principal on borrowings.  Combined, Canada and Australia

---

[2] All amounts in U.S. dollars.

paid dividends of $215 million, or 45%, of the $478 million in distributions "upstreamed" by Genworth's subsidiaries to the holding company in 2011.  The Australian MI unit contributed $125 million, and the Canadian business contributed $90 million.  As an April 11, 2012 BTIG analyst report noted regarding the apparent strength of these subsidiaries:

> The mortgage markets in Canada and Australia are structurally quite different from the U.S. mortgage market. One of the key differences is the fact that Canada and Australia each have legal recourse laws that reduce the risk of borrowers walking away from their mortgages, while in the U.S. reports of borrowers leaving their keys and abandoning their homes have been rampant.

6.     On September 26, 2011 the Company issued a presentation (the "September 2011 Presentation," the contents of which were not discussed by the market) on the Australian MI unit that addressed the strength of the Australian housing market, even in the wake of flooding in the Queensland region in January 2011.   The presentation emphasized the advantages of the Australian mortgage environment over the U.S. environment, with an "engaged regulator overseeing banks and insurance companies," "solid economic fundamentals," and "house prices supported by market fundamentals."   The presentation further asserted "expect[ed] ongoing strong employment" with only "some regional pressure in Queensland," highlighted Australia's "0.5%" delinquency rate compared to the U.S. rate of 3.7%, and in the "Risk Management" section noted that the Company had "modified 'high-risk' areas based on environment" with specific reference to the "Queensland Coastal Area," as well as the "2007/2008 [loan origination] Books – Queensland Region Pressured."   The presentation noted under "Book Year Delinquency Development" that the "2007/2008 vintages [were] above expected levels," and in particular that "small business/self employed [were] impacted by retail spending decline," but did not address the types of loans in the 2007/2008 vintages that were experiencing these "above expected levels" of delinquencies.

7.     The September 2011 Presentation also noted that while "overall economic conditions were solid," Queensland was the "primary driver of [the] increase" in delinquency rates, due to factors including "Queensland flooding," "retail spending down," and "small businesses pressured."   The presentation then addressed the measures taken to mitigate the Queensland risk, stating that a "7.5MM flood reserve" had been established "in 1Q 11" and projecting a "second half [2011] loss ratio in high 40's/low 50's."   The loss ratio is the ratio of claims on policies and loss reserves to net premiums earned from the insurance.   As part of "Risk Management – Loss Mitigation," the presentation stated that Genworth would "*accelerate action on late stage delinquencies.*"[3]   The presentation further asserted that reserve levels per delinquency were "based on historical experience and economic trends," with "severity and frequency factors derived by LTV [loan to value] and delinquency category," and that Genworth "monitor[ed] reserve adequacy and key loss metrics quarterly," with a "quarterly actuarial review by [an] independent actuary."   The presentation reminded investors that Australia had a "strong financial track record."   Thus, the presentation gave investors assurance that the Australian market was sound, and that known risks related to Queensland and the 2007/2008 books were being effectively managed and mitigated.

8.     A month later, a November 4, 2011 Morgan Stanley analyst report referenced a presentation that Genworth issued for purposes of calming concerns that the Australian housing market would be vulnerable to a downturn:

> [T]here is concern that the Australian housing market could be vulnerable to a downturn, especially given mixed recent economic data. *While management recently issued a presentation trying to calm these concerns, pointing to things that mitigate risks in this market, including the stronger economy, with low unemployment and stronger GDP growth, the excess of demand for houses over*

---

[3] All emphases added unless otherwise noted.

> *supply and the determinant of borrower recourse*, we believe the
> state of the housing market deserves close attention.

9.      Having referenced the strength of the Australian MI unit and the stability of the

Australian market in the September 2011 Presentation, on November 3, 2011, the first day of the

Class Period, Genworth reported its 3Q 11 earnings and announced that it planned a minority

40% initial public offering ("IPO") of its Australian subsidiary for the second quarter of 2012.

The Company had completed a similar minority IPO of its Canadian subsidiary in July 2009,

retaining approximately 57.5% of outstanding shares.

10.      Analysts following the Company overwhelmingly viewed the IPO as a "positive,"

as it would "unlock" some of the value in one of the Company's best assets, and free up capital

for a range of uses, including a potential share repurchase that would return value to Genworth's

shares, which had been impacted by the poorly performing U.S. MI unit.

11.      Throughout the Class Period, Defendants misleadingly portrayed the Australian

unit as being stable, and touted the overall strength of the Australian economy and housing

markets.   Reported loss ratios remained stable at 45%, 48%, 48%, and 46% for Q1, Q2, Q3, and

Q4 2011, respectively.   On February 3, 2012, during the 4Q11 earnings call, Klein stated that

"the loss ratio [for the Australia MI unit] decreased 2 points sequentially to 46%, reflecting a

decline in new [mortgage loan] delinquencies.  *The delinquency rate improved across all regions

sequentially*."

12.      Similarly, the February 27, 2012 10-K for FY 2011 stated that "[i]n Australia, the

housing market has remained fairly stable with home prices and unemployment remaining

consistent with the third quarter of 2011."   Addressing the Queensland region that had been

affected by flooding that occurred in January 2011, Fraizer stated on the November 4, 2011 3Q

11 earnings call that "Australia is transitioning *as expected, absorbing the loss pressures* coming

from the early 2011 Queensland flood events as well as the combined pressures of higher interest rates and living costs, an elevated currency, and lower consumer spending on some small business owners and consumers."  The February 27, 2012 10-K further reassured investors that conditions had since stabilized since the Queensland flooding:

> In the first quarter of 2011, losses began to increase driven by higher rates, lower retail spending and higher reserves for claims anticipated from the natural disasters during that quarter, particularly the flooding in Queensland. During the second and third quarters of 2011, there was an increase in the number of outstanding delinquencies and reserves as the cumulative impact of the factors noted previously exerted pressure on elements of the portfolio. *During the fourth quarter of 2011, total delinquencies decreased* but remained above 2010 levels and the rate of new delinquencies slowed. *We expect overall 2012 losses to remain near 2011 levels.*

13.     Accordingly, investors had no reason to suspect that the Australian MI unit – and the planned Australian IPO – was subject to any sudden destabilization.  Moreover, the February 27, 2012 10-K detailed risk management procedures that bolstered Defendants' misleading Class Period statements on delinquencies and reserves, including that management reviewed reserves – and the assumptions underlying reserve adequacy – every quarter:

> Management reviews quarterly the loss reserves for adequacy, and if indicated, updates the assumptions used for estimating and calculating such reserves based on actual experience and our historical frequency of claim and severity of loss rates that are applied to the current population of delinquencies. Factors considered in establishing loss reserves include claim frequency patterns (reflecting the loss mitigation actions on such claim patterns), the aged category of the delinquency (*i.e.*, age and progression of delinquency to claim) and loan coverage percentage.

14.     The 10-K also reassured investors that the Company had processes to ensure the timely receipt of information (including delinquencies) from its loan servicers.

> *We have established processes, as well as contractual rights, to ensure we receive timely information from loan servicers to aid us*

6

in the establishment of our estimates. In addition, when we have obtained sufficient facts and circumstances through our investigative process, we have the unilateral right under our master policies and at law to rescind coverage ab initio on the underlying loan certificate as if coverage never existed.

15.     These risk policies, and the purported stability of the Australian unit's loss ratios for FY 11 – *i.e.*, for at least three quarters following the Queensland floods – underpinned the misleading impression that the Australian IPO was, as Defendants falsely asserted, on track.  On February 3, 2012, both Fraizer and Klein emphasized the importance of the IPO and stated that the IPO was on track.  Fraizer confirmed that "[w]e have not encountered *any regulatory or market conditions* that would change that timing."  As late as *March 29*, 2012, Klein answered a question specifically on the timing of the IPO by stating that "[w]e're working very actively to put ourselves in a position to execute this in the second quarter [of 2012]," and gave no indication that Defendants had encountered any obstacle to the IPO.

16.     At the same time Defendants were misleading the market into believing that the Australian IPO would proceed as planned based on the seeming stability of the Australian MI unit and their robust risk management procedures, however, delinquencies and claims from the Queensland region, and on high-risk low-documentation loans issued in 2007 and 2008, increased sharply during the Class Period.  As Jerome Upton ("Upton"), the CFO of Genworth's Global Mortgage Insurance, acknowledged after the Class Period on the May 2, 2012 1Q 12 earnings call, "[i]n the second half of 2011, we did see increasing delinquency levels and we did observe lender processing delays… the claim paid counts did increase in January and February but it was – the March loss emergence and the average claims size, that really gave rise to our deep dive on the delinquency inventory."

17.     Notwithstanding the Company's previously stated risk measures – including accelerating late stage delinquencies; contractual rights ensuring timely lender servicer

information; and quarterly review of delinquencies and reserves – Upton further stated that "[d]uring 2011, as delinquencies increased during the year, certain lender servicing routines fell behind which created processing delays and caused backlogs of delinquencies."  The Company disclosed that the number of claims paid increased 30% from December 2011 to January 2012 alone, and the Australian MI unit's loss ratio skyrocketed from 46% in 4Q 11 to *154%* in 1Q 12. Australia also recorded its first historical loss, as Genworth was forced to allocate $82 million (before taxes) to shore up the unit's loss reserves.

18.     Former employees confirmed that the Australian MI unit was experiencing a spike in claims during the Class Period.  A former Senior IT Infrastructure Program Manager and North America IT Infrastructure Leader (MI division) who participated in quarterly MI meetings (called Leadership and Management, or "L&M," Meetings) led by Kevin Schneider ("Schneider," CEO and President of Genworth Mortgage Insurance) and Upton, learned at an L&M meeting in early-mid December 2011 that the Australian MI unit had had a poor quarter due to increased claims, and that those claims were exceeding the Company's loss reserves. According to this former manager, the December 2011 meeting featured a Powerpoint presentation that showed an increase in claims in Australia of *$100-125 million*.

19.     Yet at no time during the Class Period did Defendants disclose to the market that Australian trends were worsening.  On the contrary, Defendants systematically misled the market into believing that Australia was stable, with the Queensland risk known and effectively managed/mitigated, and that there were no market conditions that would delay the IPO.  For example, the 10-K for FY 11 stated that the Australian loss ratio for 4Q 11 had *decreased* to 46% from 48% in 3Q 11, and on the February 3, 2012 4Q 11 earnings call Klein attributed that decrease to "a *decline* in new delinquencies," further stating that "[t]he delinquency rate

improved across *all regions* sequentially." The February 2, 2012 4Q11 earnings release specifically noted that "higher severity experience in the New Zealand run-off portfolio [were] partially offset by a decrease in new delinquencies, *including reductions in Queensland*."

20.     On February 8, 2012, a post on the *Wall Street Journal* Deal Journal Australia blog reported that UBS, Macquarie Group and Commonwealth Bank of Australia had been given joint lead manager mandates for the IPO, joining lead manager Goldman Sachs.

21.     Only two months further into the lead managers' due diligence process for the IPO, however, the truth about the Australian MI unit's financials was disclosed when the Company announced after the market closed on April 17, 2012, that the IPO would be delayed until at least "early 2013," with the "new timeframe primarily reflect[ing] recent business performance in Australia":

> For the 2012 first quarter, the company expects to report elevated loss experience in Australia as lenders accelerated the processing of later-stage delinquencies from prior years through to foreclosure and claim at a higher rate and severity than expected, particularly in coastal areas of Queensland that experienced natural catastrophes and regional economic slowdowns and among certain groups of small business owners and self-employed borrowers. First quarter experience is anticipated to result in a modest first quarter loss in the Australian MI business.

22.     The market was shocked at the abrupt reversal in the Australian MI unit's financials and the announced IPO delay, when only weeks earlier, on March 29, 2012, Klein had not disclosed any indication that economic conditions might force a delay. An April 18, 2012 Morgan Stanley analyst report noted the discrepancy between the reversal and the September 2011 Presentation: *"[w]hile the company had been downplaying these concerns* [about the Australian housing market], *including publishing an in-depth presentation in September 2011 in order to demonstrate the strength of its fundamentals*, the news of accelerating progression to foreclosure and higher-than-expected severity appears to confirm investors' fears about this

business."  A Sandler O'Neill analyst report expressed complete surprise given the Company's misleadingly asserted risk mitigation in the Queensland region: "[n]or did we see any indications that this loss was evolving; we had recognized that the Australian economy had slowed.  Perhaps we misinterpreted the indicators.  We had not anticipated the flooding events would cause a loss."

23.      Similarly, an April 19, 2012 article in the *Australian Financial Review* stated that Genworth had "delivered bad news out of the blue and in the process *raised serious doubts about [its] past risk management practices*."  The article further noted that "flooding was an issue behind delinquencies rising sharply in the first quarter but it is hard to avoid the impression that the mortgage insurer has been allowing borrowers to string out their payments on hardship grounds when they were never going to be able to repay.  Also, *the flooding occurred long ago in Queensland and has been well and truly dealt with by [Genworth's] major competitor*."  The article observed that the "blowout in losses [is] not typical of the LMI [lender mortgage insurance] sector in Australia over the past five years.  One suspects that Genworth was writing LMI on high-risk loans to achieve volume targets in readiness for the IPO."

24.      On the news of the IPO delay and the first-ever reported loss by the Australian MI unit, Genworth's stock price plummeted *over 23%* in a single day on unusually heavy trading volume, with 75,351,400 shares traded compared with an average daily trading volume over the Class Period of 9,367,804 shares.  Fraizer resigned two weeks later.

## II.      <u>JURISDICTION AND VENUE</u>

25.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

27. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

28. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

III.   **PARTIES**

29. On July 25, 2014, the Court appointed Hialeah and New Bedford to serve as Lead Plaintiffs in this securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. 104-67, 109 Stat. 737.

30. Lead Plaintiff Hialeah is a defined benefit pension plan administered by a seven-member Board of Trustees that provides retirement and related services to employees of the City of Hialeah, Florida.   Hialeah oversees approximately $737 million in assets on behalf of employees, retirees and beneficiaries of the City of Hialeah.   As set forth in the certification annexed to Hialeah and New Bedford's Motion for Appointment as Lead Plaintiff, incorporated by reference herein, Hialeah purchased Genworth's securities on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

31. Lead Plaintiff New Bedford is a public pension system administered by a five-member board for the purpose of providing disability, retirement, and related services to public employees of the City of New Bedford, Massachusetts, and their beneficiaries. New Bedford managed approximately $276 million in assets on behalf of more than 4,100 plan participants and their beneficiaries as of December 31, 2013.   As set forth in the certification annexed to

11

Hialeah and New Bedford's Motion for Appointment as Lead Plaintiff, incorporated by reference herein, New Bedford purchased Genworth's securities on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

32.     Defendant Genworth is a leading financial security company that provides insurance, wealth management, investment and financial solutions to more than 15 million customers, with a presence in more than 25 countries.  Genworth was a subsidiary of General Electric until May 2004, when it was spun off in an initial public offering, and the Company was incorporated in Delaware in 2003 in preparation for the initial public offering.  Genworth is headquartered in Richmond, Virginia and has approximately 6,400 employees.  Genworth's securities, at all times relevant here, traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GNW."

33.     Defendant Fraizer was, at all relevant times during the Class Period, the Company's President and Chief Executive Officer, and Chairman of the Board of Directors. Fraizer resigned in May 2012, shortly after the truth about the Australian MI unit's financials was disclosed.  Fraizer was a direct and substantial participant in the fraud.

34.     Defendant Klein is Genworth's Chief Financial Officer and Executive Vice President.  Klein was a direct and substantial participant in the fraud.

35.     Defendants Fraizer and Klein are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Genworth, are collectively referred to as the "Defendants."

## IV.    CONTROL PERSON ALLEGATIONS

36.     The Individual Defendants, because of their positions of control and authority as senior executive officers (and as Director for Fraizer), had access to the adverse, undisclosed information about Genworth's business through their access to internal corporate documents and

information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

37.     Each of the above officers of Genworth, by virtue of his high-level position with the Company, directly participated in the management of the Company, and was directly involved in the day-to-day operations of the Company at the highest levels.   The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.   Both Fraizer and Klein repeatedly emphasized the importance of the Australian IPO to the Company during the Class Period.   The Australian MI unit was historically one of the Company's best performing, and contributed hundreds of millions in dividend payments to the holding company, including over a quarter, or 26%, of the total dividend payments upstreamed by Genworth's subsidiaries to the holding company.   The Australian   MI unit's loan delinquency rates, loss reserve adequacy and risk management procedures were fundamental aspects of Genworth's business that the Individual Defendants followed, tracked, and were aware of, or should have followed, tracked and been aware of, at all times.

38.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent

their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

39.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

40.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Genworth's securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding the Australian IPO and the Australian MI unit's financials, including the undisclosed increase in delinquencies and claim payments. The scheme: (i) deceived the investing public regarding Genworth's operations and business, and the true value of Genworth's securities; and (ii) caused Plaintiff and other members of the Class to purchase Genworth's securities at artificially inflated prices, which fell as the truth concerning the Australian MI unit ultimately became known.

41.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Genworth, were acting on behalf of the Company

in the regular course of business.   Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   The Company and its Business

42.   Genworth is a leading provider of mortgage insurance products in Canada, Australia, Mexico and multiple European countries.   Within its International Mortgage Insurance segment, the Company's products predominantly insure prime-based, individually underwritten residential mortgage loans, also known as flow mortgage insurance, to lender servicers and banks.   On a limited basis, Genworth also provides mortgage insurance on a structured, or bulk, basis that aids in the sale of mortgages to the capital markets and helps lenders manage capital and risk.   Additionally, the Company offers services, analytical tools and technology that enable lenders to operate efficiently and manage risk.   For the year ended December 31, 2011, the segment's net income available and net operating income were $357 million and $332 million, respectively.

43.   Because Genworth acts as a holding company for its subsidiaries and does not have any significant operations of its own, it depends on dividends from its subsidiaries and payments under tax sharing arrangements with its subsidiaries as its principal sources of cash for operating expenses, and interest and principal on borrowings.   Combined, Canada and Australia paid dividends of $215 million, or 45%, of the $478 million in distributions "upstreamed" by Genworth's subsidiaries to the holding company in 2011.   The Australian MI unit contributed $125 million, or more than a quarter of the total dividend amount.

44.   The majority of Genworth's foreign MI insurance contracts are "single premium," *i.e.*, the premium is a one time up-front payment, as opposed to monthly renewal premiums in the U.S..   The Company recognized these single premiums over the policy life in accordance

15

with the expected pattern of risk emergence.  Together with the greater legal recourse available

against borrowers in Australia, the MI business there was viewed as more stable than in the U.S..

      **B.**      **Genworth Announces the Australian IPO and**
                  **Emphasizes its Importance Throughout the Class Period**

      45.      On November 3, 2011, the first day of the Class Period, Genworth reported its 3Q

11 earnings and announced that it planned a minority 40% in initial public offering ("IPO") of its

Australian subsidiary for the second quarter of 2012, with Fraizer highlighting "consistent

overall international performance":

> Genworth plans to pursue a minority initial public offering (IPO)
> of its Australian mortgage insurance business in the second quarter
> of 2012, subject to market conditions and regulatory review and
> approval. This move is part of a broader strategy to rebalance the
> business portfolio, support future growth opportunities for the
> Australian business with expanded access to the capital markets,
> maintain control positions of strategic mortgage insurance
> platforms in Australia and Canada, and together with other actions,
> free material capital for redeployment. The company anticipates
> selling up to 40 percent of its holdings, while maintaining a control
> position.

      46.      Analyst reaction was positive.  A November 4, 2011 Credit Suisse report

observed that the IPO "could fetch [Genworth] $560-720 [million] of immediate additional

liquidity while also enhancing its financial flexibility."  A November 4, 2011 J.P. Morgan report

called the IPO a "positive catalyst" that "would enable management to monetize a major asset

and could provide investors greater comfort in the value of the company's international MI

franchise."  The same report commented that "foreign MI business has sustained strong returns

throughout the downturn as the housing markets in Canada and Australia have been relatively

resilient," and specifically noted that while "[c]laims in Australia remain elevated given

continued weakness in Queensland following severe flooding," "the [reported] *loss ratio held up*

*better than expected*."

47.     Throughout the Class Period, both Fraizer and Klein repeatedly emphasized the importance of the Australian MI unit and the IPO.  For example, on the November 4, 2011 3Q earnings call, Fraizer stated that:

> *[W]e see Australia as an important business*. I think it is a good platform with good potential. Our desire has been to maintain control of our leading private MI platforms, and I'd put both Australia and Canada in those categories as they act as *a key source of earnings, capital, and returns. And certainly those benefit the holding company and the enterprise*.
>
> Our view is that this [IPO] transaction helps you retain those benefits but it also helps you rebalance exposures in the portfolio; it helps broaden the Australian capital base…. And it frees capital for redeployment, and when you look at our valuation, redeployment through share repurchase is quite compelling. So I think is we get to intersect a number of benefits.

48.     Similarly, at the March 29, 2012 JP Morgan Insurance Conference, Klein stated that:

> In recent years and looking forward the Australian and Canadian businesses have been capital generators providing dividends to the holding company. In 2011 those two businesses paid a total of $215 million in dividends to the holding company. We pursued growth in these markets in a disciplined way with sound underwriting guidelines…. *The minority IPO is one of our most important initiatives*. We're pursuing this plan in order to rebalance our mortgage insurance exposures and support future growth of the business as well as support our capital management and deployment strategies.
>
> ***
>
> I would say this IPO for a number of reasons is *a very, very important transaction for us*. It's important in that it helps us rebalance our exposure to housing markets, particularly in a commodity type, linked type of economy, so that's helpful from that standpoint. It also helps us generate some capital that we can hopefully use for some other purpose including maybe something for shareholders over a period of time. *So it's very important from that lens*.

C.     **Defendants Create a Misleading Impression
of Financial Stability for the IPO**

49.     Throughout the Class Period, Defendants misleadingly portrayed the Australian
unit as being stable.  Addressing the Queensland region that had been affected by flooding that
occurred in January 2011, Fraizer stated on the November 4, 2011 3Q 11 earnings call that
"Australia is transitioning *as expected, absorbing the loss pressures* coming from the early 2011
Queensland flood events as well as the combined pressures of higher interest rates and living
costs, an elevated currency, and lower consumer spending on some small business owners and
consumers."

50.     Similarly, reported loss ratios remained stable at 45%, 48%, 48%, and 46% for
Q1, Q2, Q3, and Q4 2011, respectively.  On February 3, 2012, during the 4Q11 earnings call,
Klein stated that "the loss ratio [for the Australia MI unit] *decreased* 2 points sequentially to
46%, reflecting a *decline in new delinquencies.  The delinquency rate improved across all
regions sequentially*."  The February 2, 2012 4Q11 earnings release specifically noted that
"higher severity experience in the New Zealand run-off portfolio [were] partially offset by a
decrease in new delinquencies, *including reductions in Queensland*."

51.     The February 27, 2012 10-K for FY 2011 stated that "[i]n Australia, the housing
market has remained fairly stable with home prices and unemployment remaining consistent with
the third quarter of 2011."  The 10-K further reassured investors that conditions had since
stabilized since the Queensland flooding:

> In the first quarter of 2011, losses began to increase driven by
> higher rates, lower retail spending and higher reserves for claims
> anticipated from the natural disasters during that quarter,
> particularly the flooding in Queensland. During the second and
> third quarters of 2011, there was an increase in the number of
> outstanding delinquencies and reserves as the cumulative impact of
> the factors noted previously exerted pressure on elements of the
> portfolio. *During the fourth quarter of 2011, total delinquencies*

*decreased* but remained above 2010 levels and the rate of new delinquencies slowed. *We expect overall 2012 losses to remain near 2011 levels.*

52.     Analysts took note of the purported decrease in Queensland delinquencies.  A February 3, 2012 Credit Suisse report commented on "solid operating income of $53mm, in line with our estimates, as the loss ratio decreased sequentially to 46% from 48% in 3Q (and also in 2Q), better than our 50% estimate… The book value of the Australian MI was $2.1b at 4Q11; assuming GNW sold 40% at 0.75x, the sale would generate $630mm of proceeds."

53.     A February 3, 2012 JP Morgan analyst report also noted the purported stabilization of the Queensland region:

> [T]he loss ratio in Australia improved from 3Q11 as housing trends seem to be recovering….   In Australia, the loss ratio improved from 48.6% in 3Q11 to 46.0% due to fewer new delinquencies. Results in the Queensland area, which have been weak in recent quarters following severe flooding in early 2011, *also appear to be recovering*. In addition, we are encouraged by the increase in mortgage origination activity, which suggests the real estate market in Australia is recovering up after slowing earlier in the year.

54.     A February 3, 2012 Scotiabank analyst reported that "[i]n Australia, the loss ratio rose to 46%, nine points higher than the prior year, but two points lower than Q3/11, *as lenders accelerated actions to move loans through to claim*, and increased severity in New Zealand was only partially *offset by lower new delinquencies in Queensland*."

**D.     Defendants' Purportedly Robust Risk Management Procedures Bolster their Misrepresentations**

55.     The February 27, 2012 10-K detailed risk management procedures that bolstered Defendants' misleading Class Period statements on delinquencies and reserves, including that management reviewed reserves – and the assumptions underlying reserve adequacy – every quarter:

> Management reviews quarterly the loss reserves for adequacy, and if indicated, updates the assumptions used for estimating and calculating such reserves based on actual experience and our historical frequency of claim and severity of loss rates that are applied to the current population of delinquencies. Factors considered in establishing loss reserves include claim frequency patterns (reflecting the loss mitigation actions on such claim patterns), the aged category of the delinquency (*i.e.*, age and progression of delinquency to claim) and loan coverage percentage.

56. The 10-K also reassured investors that the Company had processes to ensure the timely receipt of information (including delinquencies) from its loan servicers.

> *We have established processes, as well as contractual rights, to ensure we receive timely information from loan servicers* to aid us in the establishment of our estimates. In addition, when we have obtained sufficient facts and circumstances through our investigative process, we have the unilateral right under our master policies and at law to rescind coverage ab initio on the underlying loan certificate as if coverage never existed.

57. At the March 29, 2012 JP Morgan Insurance Conference, Klein added to the impression that Genworth conducted robust review of its books, including stress testing:

> **Unidentified Audience Member**
>
> The Australian and Canadian business, what sort of parameters do you employ in your stress test?
>
> **Martin Klein - Genworth Financial, Inc. - SVP & CFO**
>
> *We do stress testing across all the platforms, obviously*, and I think one of the benefits of now going into this year operating under a common platform where we'll be able to bring best practices in place from a modeling perspective really across the businesses, but we do look at stress tests of businesses.
>
> Those economies obviously work differently than the US economy. The housing markets in those regions also are very different than the housing markets here…. We also have to look at the exposure that the different economies have so for example both Canada and Australia obviously are more commodity linked economies than say the US is which is perhaps a more diversified economy. So we have to look at as we model under stress not just

20

> different stressors in the economy, but we also look at certain global events or certain economies that slow down and how that ripples through.

58.     These risk policies, and the purported stability of the Australian unit's loss ratios for FY 11 – *i.e.*, for at least three quarters following the Queensland floods – underpinned the misleading impression that the Australian IPO was, as Defendants falsely asserted, on track.  On February 3, 2012, both Fraizer and Klein emphasized the importance of the IPO and stated that the IPO was on track.  Fraizer confirmed that "we have not encountered *any regulatory or market conditions* that would change that timing."  As late as *March 29*, 2012, Klein answered a question specifically on the timing of the IPO by stating that "[w]e're working very actively to put ourselves in a position to execute this in the second quarter [of 2012]," and gave no indication that Defendants had encountered any obstacle to the IPO.  Klein further reassured investors that "[w]hat we wanted to do all along is do this [IPO] transaction *from a position of strength*."

**E.     Contrary to Defendants' Misrepresentations, Claims and Delinquencies Increase Sharply During the Class Period, Exceeding Reserves**

59.     At the same time that Fraizer and Klein were reassuring investors that no economic conditions warranted a delay in the IPO, and as the Company continued to report stable loss ratios, internal data revealed a significant increase in claims and delinquencies in Australia during the Class Period.

60.     CW1 was a former Senior IT Infrastructure Program Manager and North America IT Infrastructure Leader (MI division) in the Company's Raleigh, North Carolina location from October 1999 to April 2014.  CW1 reported to Vice President of Technical Services (MI), Robert McKeown, who in turn reported to Chief Information Officer of MI, Deb Lely, who in turn reported to both Genworth's COO and the CEO/President of Genworth Mortgage Insurance,

21

Schneider.   Both the COO and Schneider reported to Fraizer.   According to CW1 his responsibilities included designing and building Genworth's servers for the Company's Global MI locations and providing guidance to each location's local IT team, including Australia's, with operational needs such as remotely downloading patches and supporting email systems.

61.    CW1 recalled comments by both Fraizer and Schneider at several all-employee meetings that they would be traveling to Australia in the year leading up to the IPO, and believed that Fraizer and Schneider traveled to Australia more frequently during that year.   CW1 also recalled Upton traveling with them to Australia as well, explaining that it was his responsibility to support them from an IT perspective when they went overseas.   CW1 recalled noticing they were travelling to Australia during that time more often than they had in the past, and traveling there more than they were to other foreign MI units.

62.    According to CW1, Schneider and Upton led quarterly domestic MI meetings called Leadership and Management ("L&M") meetings in Raleigh, where they would discuss Genworth's Global MI issues and update the MI employees as to how Global MI was trending. CW1 stated that these meetings occurred during the beginning or middle (depending upon Schneider's and Upton's schedules) of the last month in each quarter before the Company publicly announced quarterly results.   CW1 explained that the top three MI "bands" or tiers of Raleigh-based employees participated in the L&M meetings, with Band 1 including MI senior level executives like Schneider, Band 2 Executive Vice Presidents, and Band 3 director and director-like employees such as CW1 himself.   According to CW1, the quarterly domestic MI meetings consisted of about 40 – 50 MI employees, including around 10 senior IT employees of the MI division.

63.     CW1 recalled discussions in these quarterly meetings led by Schneider and Upton that the Australian IPO was important to Genworth in order to free-up capital for Global MI, U.S. MI and other lines of business such as Long Term Care, as well as buying back company stock and thereby increasing the value of the shares in order to please shareholders.   CW1 described the IPO as being very important to Genworth and that the intent to having it occur in the first half of 2012 was a topic at each of these quarterly meetings, where it was frequently discussed.

64.     CW1 stated that this changed by the quarterly meeting that was held in either early or mid-December 2011.  According to CW1, at this meeting, either Schneider or Upton fielded the question as to whether the IPO was still planned for in the early part of 2012.  The response was that the Australian MI unit had had a poor quarter due to increased claims, leading to miscalculating of reserves, and that claims were exceeding the allotted reserves.

65.     CW1 recalled a Powerpoint presentation in this meeting showing the increase in claims in Australia equaling around *$100-125 million*, and that this never had happened before to the Australian unit.   CW1 observed that the loans affected by the flooding were mostly in Queensland, and were predominantly secondary/vacation homes and not primary residences. According to CW1, Genworth, like any mortgage insurance company, would have factored those conditions into calculating risk and reserves because they were properties that homeowners were more likely to walk away from if trouble occurred.

66.     CW1 noted that all MI financial information flowed through Upton, whose office was next to Schneider, who in turn reported to Fraizer, and accordingly that information was likely being provided to Fraizer much more frequently than monthly or quarterly.

67.     CW2 was employed by Genworth from 2006 to 2012.  CW2 described his role as being in-charge of the day-to-day operations of the Australian MI unit as its Chief Operating Officer from 2010 through early 2012, working mostly in Australia until he was transferred back to the U.S. around February 2012.  Prior to being the Australian COO, CW2 served as Vice President of International Operations from 2006 to 2010 in Raleigh, North Carolina location. During his tenure as COO in Australia, CW2 reported to Ellie Comerford, CEO and Managing Director of Genworth's Australia MI Unit, who in turn reported to Fraizer.  CW2 recalled Fraizer visiting Australia in the Fall of 2011, accompanied by COO Upton.

68.     CW2 confirmed the L&M meetings were led by Upton and that they reviewed updates on the different global MI units.  CW2 also recalled that throughout 2011, there were internal reports showing an increase in delinquencies in Australia.  CW2 further recalled internal discussions of trends and stated that documents forecasting risk were updated monthly.

69.     According to CW2, Genworth Corporate was informed about current defaults and default forecasts because such reports were provided monthly by the international corporate units, including Australia, to the "Corporate international team."  CW2 stated that Corporate would have been made aware of 1) hardship exemptions in Australia; 2) delinquency "walk" (lengthier delinquencies), including specifics regarding the period of time particular loans were delinquent and how they were being cured; 3) reports claims; and 4) reports on short-selling of homes.

70.     CW2 further stated that the monthly reporting package given to Corporate was reviewed by Upton and Genworth's Chief MI Risk Officer, Sam Marsico ("Marsico"). According to CW2, the package included Australian financials, loss mitigation, risk evaluation of the trending market, and identified "trigger points" as part of the portfolio's risk analysis.

CW2 described the package as two reports bundled into one: (1) a consolidated financial report of all the international business, with the individual financials for each international unit including Australia, that "encapsulated" high level financial information including income, estimates going forward and an operational take; and (2) the risk report, assembled by the "Risk Team," that reported both delinquencies and where the Risk Team foresaw the trends or issues in their market. CW2 added that meetings in which they would discuss the trends happening versus what had been forecasted by the risk department would also be documented in the monthly risk report. CW2 stated that these reports went to Fraizer on a monthly basis. According to CW2, the reports were distributed via email. CW2 stated that he was responsible for including the operational information for the Australian unit prior to leaving Australia for the U.S. around February 2012.

71.    CW2 further stated that Genworth Australian CFO Anne O'Driscoll and Upton were involved in calculating and reporting loss reserves, and that Upton also had all of the international finances reported to him. CW2 recalled that O'Driscoll's predecessor, Edward Pike (the former CFO of the Australian and New Zealand Mortgage Insurance units from February 2007 to November 2009) had set-up the methodology used by Genworth Australia to calculate reserves and that O'Driscoll continued to use his methodology. According to CW2, Genworth had its own proprietary system that was used for reporting default rates and specifics about loans

72.    CW2 also described a monthly international call, in which he participated, that Fraizer would "get on" to at a minimum on a quarterly basis. According to CW2, the monthly call would take place on the second Thursday night of the month (Friday morning in Australia). The calls were led by Upton. CW2 stated that Klein also participated in these calls, providing an update on the Company's finances based on information from meeting with the finance team

prior to the monthly call.  CW2 further recalled that when he participated in the calls with Upton and Marsico, default rates in Australia were definitely discussed.   On the calls that Fraizer participated in, CW2 recalled discussions regarding "what's driving the conditions in the marketplace" and the forecasts.   According to CW2, there was "certainly evidence" that the economic conditions in Australia were deteriorating prior to the IPO.  CW2 added that after the international call, there was usually a higher-level, executive call he was aware of but did not participate in.

73.     CW2 recalled a lot of analysis being done in Australia for the investment banks that were preparing for the IPO.  According to CW2, the investment banks analyzed many of the internal metrics including monthly default figures and everything that went into calculating the unit's overall income.

74.     Only two months after a February 8, 2012 post on the *Wall Street Journal* Deal Journal Australia blog reported that UBS, Macquarie Group and Commonwealth Bank of Australia had been given joint lead manager mandates for the IPO, joining lead manager Goldman Sachs, Genworth announced that the IPO would be delayed until at least 2013, and that the Australian MI unit would post its first-ever loss in 1Q 2012, based on increased claims and delinquencies stemming from the Queensland region.

75.     After the Class Period, Upton acknowledged that economic conditions in the Queensland region had deteriorated, driving the delinquencies and claims.  Upton also blamed lender server processing delays for building a backlog in delinquencies.

### F.      Genworth's False Financial Reporting During The Class Period

76.     To inflate the prices of Genworth's securities, Defendants caused the Australian MI unit to falsify the financial results reported in its public financial statements for the third and fourth quarters of FY 2011 as well as for the year ended FY 2011.  Defendants, in violation of

Generally Accepted Accounting Principles ("GAAP"),[4] failed adequately to estimate the loss reserves reported on Genworth's balance sheet, and the Company's corresponding loss reserve expenses were materially understated on its income statement.  These GAAP violations resulted in a material overstatement of the Company's net income and EPS during the Class Period, as set forth *infra* in ¶89.

77.    Genworth's reported Class Period financial results were included in its 3Q 2011 Form 10-Q filed with the SEC on November 7, 2011; FY 2011 Form 10-K filed on February 27, 2012; and in Forms 8-K containing the earnings press releases and related financial supplements for third quarter, fourth quarter and year-end 2011.[5]  Defendants falsely represented that the financial information was a fair statement of the Company's financial results and that the results were prepared in accordance with GAAP.  The financial information was not presented in accordance with GAAP, however, because the Company failed to establish sufficient loss reserves for its material exposure to high-risk low documentation loans from its 2007 and 2008

---

[4] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the Financial Accounting Standards Board, or FASB, issued SFAS No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162.  FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing U.S. GAAP.

[5] The Form 8-K containing the 3Q 2011 earnings release and related financial supplement was filed with the SEC on November 3, 2011.  The Form 8-K containing the 4Q and FY 2011 earnings release and related financial supplement was filed with the SEC on February 2, 2012.

vintages and for a $100-125 million increase in claims during the Class Period that exceeded the allotted reserves.

78.     Under GAAP, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss that will ultimately be resolved when one or more future events occur or fail to occur.  *See* ASC 450, *Contingencies*, at ASC 450-20-20. Genworth's established loss reserves were a loss contingency under GAAP because they represented the Company's estimate, at a certain point in time, of the ultimate costs of claims that the Company expected to pay in the future.  GAAP requires that an estimated loss from a loss contingency be accrued, *i.e.*, recorded, by a charge to income if both the following conditions are met: (1) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (2) the amount of loss can be reasonably estimated.  *See* ASC-450-20-25-2.

79.     Here, Defendants violated GAAP by failing to record adequate loss reserves for the Australian MI unit, disregarding negative facts and circumstances that were causing significantly increasing claims for the Australian unit during the Class Period.  Defendants' understatement of Australia's loss reserves resulted in a material overstatement of the Company's reported net income and EPS during the Class Period.

80.     Similarly, GAAP requires that "[a]n expense or loss [to be] recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated…."  *See* Statement of Financial Accounting Concepts ("SFAC") No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶87.  In addition, GAAP provides for the use of conservatism as a prudent reaction to uncertainty, to try to ensure

that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  SFAC No. 2, *Qualitative Characteristics of Accounting Information*, ¶¶95, 97.  Genworth's Class Period financial statements violated these basic rules of accounting for reasons summarized below.

81.     For example, Defendants failed to consider the following negative factors impacting the Australian MI unit's loss reserves, and did not provide an adequate estimate for the Company's loss reserves during the Class Period, in violation of GAAP:

- The Australian MI unit had experienced a significant increase of $100-125 million in claims during the Class Period, a circumstance that never had happened before to the Australian unit.  Further, the increased claims were exceeding the allotted reserves during the Class Period, demonstrating that those reserves had been miscalculated.  *See* ¶¶64-65.

- Unbeknownst to investors, the Australian MI unit experienced increasing losses during the Class Period because of its significant exposure to high-risk low documentation loans that it previously insured in 2007 and 2008, even though Defendants had withdrawn in late 2008 from the practice of insuring these types of problematic, low-documentation loans.  *See* ¶88, *infra*.

- Defendants were aware that the Australian MI unit was experiencing increasing delinquencies in the second half of 2011, including delinquencies arising from its low-documentation loans.  *See* ¶¶64-66, 68-75; *see also* ¶¶85-88, *infra*.

82.     Given Defendants' awareness of these negative factors, Defendants should have recorded a significant portion (if not the entirety) of the $82 million reserve charge announced at the end of the Class Period *in 3Q 11 and 4Q 11*.  In sum, the December 2011 L&M meeting disclosing that Genworth Australia had had a poor quarter because of increased claims that were exceeding allotted reserves; the Powerpoint presentation at that meeting that revealed an increase in claims of $100-125 million; the susceptibility of the 2007/2008 low-documentation loans to a weak economy; the Australian MI unit's increasing delinquencies in the second half of 2011; and a significant increase in the number and severity of claims as early as November 2011, were all

factors available to Defendants that Defendants failed adequately to account for when they established materially understated loss reserves during the Class Period.

83.     Defendants' false and misleading Class Period financial statements, and their misleading omissions regarding Genworth's accounting for loss reserves, were unquestionably material.  *See* SEC SAB Topic 1M, *Materiality* (summarizing GAAP definitions of materiality).  Among other items, SAB Topic 1M states that: "[a] matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative as well as quantitative considerations.  For example, if a misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.  Further, whether the misstatement concerns a segment of the business that has been identified as playing a significant role in the Company's operations or profitability also should be considered in determining materiality.

84.     Under these guidelines, Genworth's misstatement of loss reserves was material because a significant portion, if not the entirety, of the $82 million reserve charge announced at the end of the Class Period should have been recorded in 3Q 11 and 4Q 11.  The Australian MI unit – considered one of the Company's highest return businesses – also played a significant role in Genworth's operations and profitability, contributing over a quarter (or 26%) of the $478 million in dividend payments upstreamed by Genworth's subsidiaries to the holding company in 2011.  Accordingly, Defendants' Class Period figures and financial reporting were materially misstatements, quantitatively and qualitatively, under GAAP and SEC rules.

G.     **Defendants' Post-Class Period Admissions**

85.     On the May 2, 2012 1Q 12 earnings call, Upton and Klein gave further details on the poor performance by the Australian MI unit in 1Q 12 that forced a delay in the IPO.  Upton disclosed that the Australian MI unit's loss ratio for 1Q 12 was an incredible *154%* – a drastic

increase from the reported loss ratio of only *46%* in 4Q 11 (and ratios of 45%, 48%, and 48% in 1Q, 2Q, and 3Q 11 respectively).  The Company was forced to acknowledge severe property price declines in Queensland, leading to increased delinquencies and claims beginning in the second half of 2011, particularly in 2007/2008 loans to small business owners and self-employed borrowers.  Klein stated that:

> In Australia, the operating loss was $21 million. *The results reflected a $53 million after-tax impact from a reserve strengthening in Australia. This was driven by the combination of accelerated processing of delinquencies in our pipeline from 2011* through foreclosure to claim along with higher current and anticipated severity that we identified as we went deeper in individual claim cases during March and updated estimates for *property price declines in certain submarkets, particularly in Queensland*.

> The delinquencies we are dealing with are concentrated from geographic, vintage year, and borrower profile standpoints. They are in Queensland *in the 2007, 2008 vintages* and with small business owners and self-employed borrowers.

86.     Upton added that the Queensland region had been particularly impacted by slumping housing prices, leading to increased delinquencies, foreclosures, and consequently lender claims:

> [D]uring the first quarter, we experienced higher losses primarily due to loss reserve strengthening of $82 million before taxes or $53 million after tax, which was reviewed by independent third parties. *The major drivers of this strengthening were first, Coastal Queensland economic downturn; two, small-business self-employed borrowers in the '07 and '08 vintages*; third, the impact of lender servicing and forbearance programs; and fourth, the number of paid claims and severity.

> .... *[T]he first key driver of the reserve strengthening was the impact of the Coastal Queensland economic downturn on housing.* We have identified these areas as the Far North, Sunshine Coast, and Gold Coast, which are principally tourist areas. You will observe the differentiated performance in these areas *with peak to trough home price declines in double digits and even deeper declines on some of the foreclosed properties,* as well as

31

delinquency rates above the rest of Queensland and the overall portfolio.

These areas have been hit hard by depressed tourism particularly as the Australian dollar strengthened. Lower levels of consumer and retail spending and reduced housing demand *driving home prices lower*.

87.     Upton also admitted that Defendants had seen increasing delinquency levels as early as "the second half of 2011":

> *In the second half of 2011, we did see increasing delinquency levels and we did observe lender processing delays.* We began to work more closely with those lenders to improve the collection and default management techniques. It did accelerate some of the older delinquencies coming through and as those came through in the first quarter, *the claim paid counts did increase in January and February* but it was -- the March loss emergence and the average claims size, that really gave rise to our deep dive on the delinquency inventory and the extensive review that we undertook to strengthen loss reserves of $82 million.

88.     The April 23, 2014 Prospectus (the "2014 Prospectus") for the Australian MI unit's long-delayed initial public offering subsequently disclosed that the policies Defendants issued on high-risk low-documentation loans made to "business select" borrowers (*i.e.*, small business owners and self-employed borrowers)[6] in 2007 and 2008 represented an exposure to *over $12 billion* in those loans.   *See* 2014 Prospectus p. 58, Table 10, showing "Business Select/Low Doc" loans constituted 16% of the Australian MI unit's product portfolio for 2007, and 23% for 2008.   Multiplying these figures by the corresponding "insurance in-force"

---

[6]   Genworth removed its "Low-Doc product" in late 2008, "replacing it with the Business Select product which increased income verification of Non-Standard Loans." 2014 Prospectus at p. 55.   The 2014 Prospectus's Table 10 uses the new "Business Select" name also to refer to the older, replaced "Low-Doc" category from 2007 and 2008.   *See* 2014 Prospectus, p. 58 (referencing "Business Select/Low Doc" category).

amounts[7] yields exposure to $5.44 billion in 2007 low documentation loans and exposure to $7.13 billion in 2008 low documentation loans, or exposure to a total $12.57 billion in low documentation loans.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   Class Period Financials

89.   Defendants' failure to disclose the increasing delinquencies and claims from the Queensland region during the Class Period, as detailed in ¶¶64-66, 68-75, 85-88, rendered the Company's Class Period financials – including the Australian MI unit's grossly understated loss ratios and reserves – false and misleading.   Those misleading figures are set forth in the following tables:

| Company | 3Q11 | 4Q11 | FY 2011 |
|---|---|---|---|
| EPS | $ 0.06<br>Sources:<br>10-Q 11/7/2011;<br>8-K 11/3/2011 | $ 0.22<br>Sources:<br>10-K 2/27/2012;<br>8-K 2/2/2012 | $ 0.25<br>Source:<br>10-K 2/27/2012 |
| Net Income | $ 29 M<br>Sources:<br>10-Q 11/7/2011;<br>8-K 11/3/2011 | $ 107 M<br>Sources:<br>10-K 2/27/2012;<br>8-K 2/2/2012 | $ 122 M<br>Source:<br>10-K 2/27/2012 |

---

[7] The "risk in force" amount totaled $100 billion as of March 31, 2012.  *See* May 2, 2012 presentation entitled "First Quarter 2012 Australia Mortgage Insurance Portfolio Update," at p. 2,  available on Genworth's investor relations website.  The 2007 "risk in force" amount was 12% of the total, or $12 billion, and the 2008 "risk in force" amount was 11% of the total, or $11 billion.  *Id.*  Using the 35% loss rate reported in the FY 11 Form 10-K, p. 157 (the same rate was reported in the FY 12 10-K), the 2007 "*insurance* in force" amount was $34 billion, and the 2008 amount was $31 billion.

| Australia | 3Q11 | 4Q11 | FY 2011 |
|---|---|---|---|
| Delinquent loans | | | 7,874<br>Source:<br>10-K 2/27/2012,<br>p. 162 |
| Percentage of delinquent loans (delinquency rate) | | | 0.55%<br>Source:<br>10-K 2/27/2012,<br>p. 162 |
| Loss ratio | 48%<br>Source: 8-K<br>11/3/11, p. 37 | 46%<br>Source: 8-K<br>2/2/12, p. 40 | 47%<br>Source: 10-K<br>2/27/2012, p. 159 |
| Net losses and loss adjustment expenses (in thousands) | $ 50,269<br>Source: 8-K<br>11/17/2011, p. 2 | | $ 182,963<br>Source: 8-K<br>3/30/2012, p. 3 |
| Reserve for losses and loss adjustment expenses (in thousands) | $247,221<br>Source: 8-K<br>11/17/2011, p. 3 | | $272,028<br>Source: 8-K<br>3/30/2012, p. 4 |

90.     The 3Q 2011 Form 10-Q and the February 27, 2012 Form 10-K included certifications signed by Fraizer and Klein, required under the Sarbanes-Oxley Act of 2002 ("SOX"), representing that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

**B.      November 4, 2011 3Q 11 Earnings Call**

91.     Fraizer and Klein made the following false and misleading statements regarding the Australian MI unit's financials and the Australian market on the 3Q 11 earnings call:

> **Mike Fraizer - Genworth Financial, Inc. - Chairman, President, CEO**
>
> *Australia is transitioning as expected, absorbing the loss pressures coming from the early 2011 Queensland flood events* as well as the combined pressures of higher interest rates and living costs, an elevated currency, and lower consumer spending on some small business owners and consumers.
>
> ***

34

**Marty Klein - Genworth Financial, Inc. - SVP, CFO**

Unemployment in Canada and Australia is stable. The housing markets in both platforms are sound overall, although certain regions are feeling pressure.

\*\*\*

In Australia, excluding the current year tax adjustment, operating earnings were down 4% from last year. *The loss ratio remained flat at 48%* sequentially, reflecting the slower recovery in Queensland from flooding earlier in the year and continued pressure from higher interest rates, increased living costs, lower consumer spending, and a strong Aussie dollar, which impacts tourism and exports.

92.     These statements regarding the Australian MI unit's financials and the Australian market were false and misleading because of Defendants' failure to disclose that the Australian MI unit was experiencing deteriorating economic conditions in Queensland leading to a significant increase in delinquencies and claims. *See* ¶¶64-66, 68-75, 85-88. Fraizer's statement that "Australia is transitioning as expected, absorbing the loss pressures coming from the early 2011 Queensland flood events" including the low consumer spending on small business owners, is false and misleading because Fraizer failed to disclose that the coastal Queensland region was experiencing an economic downturn that particularly affected small business owners, driving an increase in claims of $100-125 million. *See* ¶¶64-66, 85-88. Klein's statement that "[t]he loss ratio remained flat at 48%" is similarly false and misleading because Klein failed to disclose that the significant increase in claims was exceeding the allotted reserves, and the reported loss ratio figure was, accordingly, materially understated. *See* ¶¶64-65, 76-84.

93.     Defendants also failed to disclose that the Australian MI unit was experiencing increasing losses from the policies they issued on high-risk low-documentation loans in 2007 and 2008. *See* ¶88. As a result, Genworth's loss ratio and loss reserves during the Class Period were grossly understated and its reported net income and earnings per share were materially

overstated, because of the high concentration of these defaults (and corresponding claims) in the high-risk low-documentation loans to self-employed borrowers, which required significantly higher reserves.  *See* ¶¶76-84.

      **C.**    **February 2, 2012 Form 8-K attaching February 2, 2012 Press Release**

94.    The February 2, 2012 4Q11 Form 8-K and attached press release announcing 4Q11 earnings contained the following false and misleading statement regarding Australian delinquencies: "higher severity experience in the New Zealand run-off portfolio [were] partially offset by a decrease in new delinquencies, *including reductions in Queensland*."

95.    This statement was false and misleading because Defendants failed to disclose that Queensland was experiencing increasing delinquencies, including from high-risk low-documentation loans, and an increase in claims of $100-125 million during the second half of 2011.  *See* ¶¶64-66, 68-75, 85-88.

      **D.**    **February 3, 2012 4Q 11 Earnings Call**

96.    Fraizer and Klein made the following false and misleading statements regarding the Australian MI unit's financials, the Australian market, and the Australian IPO on the 4Q 11 earnings call:

> **Mike Fraizer - Genworth Financial, Inc. - Chairman, President, CEO**
>
> Turning to International Mortgage Insurance, *we continue to move forward with our planned minority interest IPO of up to 40% of Australia Mortgage Insurance. We still anticipate second-quarter 2012 execution. We have not encountered any regulatory or market conditions that would change that timing.*
>
> \*\*\*
>
> **Marty Klein - Genworth Financial, Inc. - SVP, CFO**
>
> Unemployment rose slightly in Canada and was flat for Australia, *while the housing markets are performing as expected.*

\*\*\*

In Australia, excluding FX, operating earnings were down 9% from last year. *The loss ratio decreased 2 points sequentially to 46%, reflecting a decline in new delinquencies. The delinquency rate improved across all regions sequentially.*

\*\*\*

**Mike Fraizer - Genworth Financial, Inc. - Chairman, President, CEO**

Now, as you move over that, because you still have the Med Sup dividend that Marty talked about, we still have the closing of the GFIS sale coming, *we have the minority IPO of Australia that is moving down the track right in accordance with our plans*, and you look at therefore additional amounts, you would say – well, how would you think about those proceeds?

97.      Fraizer's statements that "we continue to move forward with our planned minority interest IPO of up to 40% of Australia Mortgage Insurance"; "[w]e still anticipate second-quarter 2012 execution"; "[w]e have not encountered any regulatory or market conditions that would change that timing"; and "the minority IPO of Australia that is moving down the track right in accordance with our plans" were false and misleading because Fraizer failed to disclose that deteriorating economic conditions in Queensland had led to a significant increase in claims and delinquencies during the Class Period, including on low documentation loans issued to small business and self-employed borrowers in 2007 and 2008, that exceeded allotted reserves – information that would, if disclosed, delay the IPO. *See* ¶¶64-66, 85-88.  Fraizer's statement that the Australian housing market was performing "as expected" was false and misleading because Fraizer failed to disclose that the Queensland coastal region's economic decline was leading to significantly increasing delinquencies and claims from severe housing price declines. *See* ¶¶64-66, 68-75, 85-88.

98.     Klein's statements that the "loss ratio decreased 2 points sequentially to 46%, reflecting a decline in new delinquencies" and that "[t]he delinquency rate improved across all regions sequentially" were materially false and misleading because of Klein's failure to disclose that delinquencies in Queensland, including on low documentation loans issued to small business and self-employed borrowers in 2007 and 2008, were significantly increasing during the Class Period.  *See* ¶¶64-66, 68-75, 85-88.

**E.**     **February 27, 2012 FY 11 Form 10-K**

99.     The February 27, 2012 FY 11 Form 10-K contained the following false and misleading statement regarding the Australian MI unit's financials:

> During the fourth quarter of 2011, total delinquencies decreased but remained above 2010 levels and the rate of new delinquencies slowed.  We expect overall 2012 losses to remain near 2011 levels.

100.     This statement regarding the decrease in total delinquencies and rate of new delinquencies, and the expectation based on Genworth Australia's quarterly review that 2012 losses would remain near 2011 losses, is false and misleading because of Defendants' failure to disclose that the Australia MI unit had experienced a significant *increase* of $100-125 million in claims in the second half of 2011, stemming from increasing delinquencies in the Queensland region and an exposure to $12 billion in low documentation loans issued in 2007 and 2008.  *See* ¶¶64-66, 68-75, 85-88.

101.     The market responded positively to the misleading statements regarding the Australian MI unit's 4Q 11 results.  A February 8, 2012 post in the *Wall Street Journal* Australia blog stated:

> In the fourth quarter, *Genworth's Australian division was its most profitable mortgage insurance division*, exceeding the income derived from Canada. Its  U.S. division recorded a net loss.

> In Australia, flow new insurance written for the quarter rose 27% year over year, thanks to an uptick in the mortgage origination market. Overall, Australia's operating earnings decreased 9% from the 2010, reflecting higher reserves for delinquencies and higher severity experience from New Zealand *partially offset by a decrease in claims from regions such as Queensland.*

102.   The Form 10-K also contained the following false and misleading statement regarding Genworth's risk management procedures:

> *We have established processes, as well as contractual rights, to ensure we receive timely information from loan servicers* to aid us in the establishment of our estimates.

103.   This statement is false and misleading because Upton acknowledged after the Class Period that a primary cause of the Australian MI unit's significant increase in claims during 1Q 12 was delays in lender servicer processing that led to a backlog of delinquencies. *See* ¶¶17, 75, 87.

F.   **February 3, 2012 Business Goals and Focus Areas Call**

104.   Klein made the following false and misleading statements regarding the Australian market and the timing of the Australian IPO at the February 3, 2012 Business Goals and Focus Areas call:

**Marty Klein - Genworth Financial, Inc. - SVP & CFO**

In Australia and Canada, *we expect stable home prices* and unemployment near current levels.

***

**Geoffrey Dunn - Dowling & Partners - Analyst**

Okay. And then how should I think about the actual dividends if you successfully complete the second-quarter minority IPO?

**Marty Klein - Genworth Financial, Inc. - SVP & CFO**

Well, with the actual – if we are able to complete the IPO and again, as Mike said on our call this morning, *our plans remain on*

*track.* I think you can anticipate obviously the holding company would have a lot more liquidity.

\*\*\*

Now when the time comes for the IPO, if we are successful at that and *again our expected timing would be some time in the second quarter*, then that obviously changes things pretty dramatically and we will revisit things at that point in time.

105.   These statements regarding the Australian market and the timing of the Australian IPO were false and misleading because of Klein's failure to disclose that the Queensland region was impacted by an economic downturn, with skyrocketing delinquencies and claims (including on low documentation loans issued to small business and self-employed borrowers in 2007 and 2008) that exceeded allotted reserves, and that those market conditions and resulting financials would force a delay in the IPO.  *See* ¶¶64-66, 68-75, 85-88.

**G.**   **March 29, 2012 JP Morgan Insurance Conference**

106.   Klein made the following false and misleading statements regarding the Australian market, Genworth's risk management procedures, and the timing of the Australian IPO at the March 29, 2012 JP Morgan Insurance Conference:

**Martin Klein - Genworth Financial, Inc. - SVP & CFO**

*This year we expect the Canadian and Australian markets to remain solid* with mortgage originations and MI market size in both Canada and Australia to remain fairly flat with market improvements – with market share improvements I should say in Canada.

**Unidentified Audience Member**

The Australian and Canadian business, what sort of parameters do you employ in your stress test?.... When you stress those markets what parameters do you choose to stress and how do you stress them?

**Martin Klein - Genworth Financial, Inc. - SVP & CFO**

Are you talking in terms of home price depreciation or [appreciation] and unemployment, things like that? Yes, we look at those parameters and stress test them and we look at the impact on delinquencies and on cure rates and things of that nature.

\*\*\*

**Unidentified Audience Member**

[C]ould you comment on the timing of the IPO of your Australian MI business? There were a couple of reports recently that the IPO may be delayed a little bit and that could have been entirely speculative in the media, but that is one of the reports that came out a few days ago. Could you tell us where you stand in the process?

**Martin Klein - Genworth Financial, Inc. - SVP & CFO**

I would say just to start out though that our rationale for doing this is perhaps different than the Company's rationale.  Back then that was a Canadian IPO. *What we wanted to do all along is do this transaction from a position of strength.*

\*\*\*

*We're working very actively to put ourselves in a position to execute this in the second quarter, as we've said.* That said, like any IPO there's a number of factors that impact timing and I think we're watching those very closely as we're working through. One is obviously market conditions and the impact that has on valuation considerations. So it's not just looking at the equity markets, *it's looking at the impact also in the Australian housing market* and things of that nature.

So going through and looking at those economics and market conditions and how those might impact valuations is one thing that we're looking at…. *So we're working really hard to put ourselves in a position to do the transaction in the second quarter*. But at the end of the day we're also going to look at where market conditions are and how that impacts valuation.

107.　Klein's statements regarding Genworth's risk management procedures, specifically stress testing "in terms of home price depreciation… and unemployment," and that the Company "look[s] at the impact on delinquencies and on cure rates" were false and

misleading because of Klein's failure to disclose that deteriorating economic conditions in Queensland had already caused delinquencies to rise significantly (including from a $12 billion portfolio of low documentation loans issued in 2007 and 2008) and an increase in claims that exceeded allotted reserves. *See* ¶¶64-66, 68-75, 85-88.

108.   Klein's statements that he expected the Australian market to "remain solid," Company would do the IPO "from a position of strength," and that "we're working really hard…to do the transaction in the second quarter" were false and misleading because of Klein's failure to disclose that deteriorating – and extant – economic conditions in Queensland and a concomitant spike in delinquencies and claims in excess of reserves would force the IPO to be delayed. *See* ¶¶64-66, 68-75, 85-88.

## VII.   THE TRUTH IS REVEALED

109.   Only *two weeks* after Klein failed to disclose – in response to a direct question about the IPO's timing – that deteriorating economic conditions and a marked increase in delinquencies and claims would force a delay of the IPO, Genworth shocked the market with an abrupt about-face.  The Company issued a press release on April 17, 2012, after the market closed, and a Form 8-K on April 18, 2012, announcing that the IPO would be delayed and that the Australian MI unit was expecting a loss for 1Q 12:

> Genworth Financial, Inc. (NYSE: GNW) today announced a new timeframe for completing its planned minority initial public offering (IPO) of up to 40 percent of its Australian mortgage insurance (MI) business. Genworth is now seeking to complete the IPO in early 2013, subject to market conditions, valuation considerations including business performance, and regulatory approvals. The Australian MI capital ratio remains sound, and the company is continuing the IPO regulatory review process. Genworth had previously targeted a second quarter 2012 IPO.
>
> *This new timeframe primarily reflects recent business performance in Australia. For the 2012 first quarter, the company expects to report elevated loss experience in Australia as lenders accelerated*

> *the processing of later-stage delinquencies from prior years through to foreclosure and claim at a higher rate and severity than expected, particularly in coastal areas of Queensland that experienced natural catastrophes and regional economic slowdowns and among certain groups of small business owners and self-employed borrowers.* First quarter experience is anticipated to result in a modest first quarter loss in the Australian MI business. A detailed report on Genworth's first quarter financial results will be provided on the company's May 2, 2012 earnings call.

110.    In response, on April 18, 2012 Genworth's stock price plummeted *over 23%* in a single day on unusually heavy trading volume, with 75,351,400 shares traded compared with an average daily trading volume over the Class Period of 9,367,804 shares.

111.    The market was stunned.  An April 18, 2012 Sandler O'Neill report noted:

> For some perspective, the *Australian mortgage insurance operations have never reported an operating loss. Nor did we see any indications that this loss was evolving*; we had recognized that the Australian economy had slowed. Perhaps we misinterpreted the indicators. We had not anticipated the flooding events would cause a loss.

> Additionally, the loss in the Australian MI operations brings the minority offering to a screeching halt – certainly not a good thing for shares of GNW…. In Australia, *we are expecting that the loss ratio will now be 125%, up from 45.0%,* and is a good deal worse than the 44.8% in the last quarter and the 45.2% loss ratio a year ago.

112.    An April 18, 2012 Credit Suisse report stated that "Bottom line: This is a negative for the stock *as many investors expected the sale of the 40% stake in the business to occur in 2Q12*, and GNW would use the proceeds to repurchase stock and repay debt."

113.    An April 18, 2012 Morgan Stanley analyst report stated:

> News of sharply deteriorating fundamentals in its Australian operation driving the delay in the planned IPO of a minority stake in these operations is a significant negative, both in terms of the earnings profile and capital position of the company.

> ***

43

While the delay in the timing is not a complete surprise,[8] the swing of these operations to a loss in the quarter is a significant negative development.

114.    Similarly, an April 19, 2012 article in the *Australian Financial Review* stated that:

[Genworth has] delivered bad news out of the blue and in the process *raised serious doubts about [its] past risk management practices*.

\*\*\*

Flooding was an issue behind delinquencies rising sharply in the first quarter but it is hard to avoid the impression that the mortgage insurer has been allowing borrowers to string out their payments on hardship grounds when they were never going to be able to repay.  Also, *the flooding occurred long ago in Queensland and has been well and truly dealt with by [Genworth's] major competitor*."

\*\*\*

The blowout in losses [is] not typical of the LMI [lender mortgage insurance] sector in Australia over the past five years. One suspects that Genworth was writing LMI on high-risk loans to achieve volume targets in readiness for the IPO.

115.    On May 2, 2012, a Bloomberg news article announced that Fraizer had resigned from Genworth.

116.    On May 2, 2012 Klein and Upton provided more detail on the 1Q 12 loss.  The Australian MI unit's loss ratio skyrocketed from 46% in 4Q 11 to *154%* in 1Q 12:

**Marty Klein - Genworth Financial, Inc. - Acting CEO**

Now turning to results, the first quarter saw good progress in U.S. life Insurance and U.S. Mortgage Insurance, stable performance in Canada as well as our investment portfolio, but very disappointing results in Australia, which resulted in delaying the timing of our planned minority IPO…. Again with the Global Mortgage Insurance division where *the reported loss on the quarter was $36*

---

[8] There had been media speculation in prior weeks that a weak IPO market in Australia – not poor financial performance by the purportedly stable Australian MI unit – could delay the IPO.

*million compared with net operating income of $16 million from the prior year....*

*In Australia, the operating loss was $21 million. The results reflected a $53 million after-tax impact from a reserve strengthening in Australia.* This was driven by the combination of accelerated processing of delinquencies in our pipeline from 2011 through foreclosure to claim along with higher current and anticipated severity that we identified as we went deeper in individual claim cases during March and updated estimates for property price declines in certain submarkets, particularly in Queensland.

The delinquencies we are dealing with are concentrated from geographic, vintage year, and borrower profile standpoints. They are in Queensland in the 2007, 2008 vintages and with small business owners and self-employed borrowers.

\*\*\*

**Jerome Upton - Genworth Financial, Inc. - Global Mortgage Insurance CFO**

Overall, our performance has been solid. However, we are seeing pressure in the Queensland region and the 2007 and 2008 vintages.

When you drill down one level, our business performance is particularly impacted by the Coastal Queensland area and small business and self-employed borrowers in the 2007 and 2008 vintages, with each representing approximately 6% of total risk in force.

\*\*\*

Turning to slide 3, during the first quarter, we experienced higher losses primarily due to loss reserve strengthening of $82 million before taxes or $53 million after tax, which was reviewed by independent third parties. The major drivers of this strengthening were first, Coastal Queensland economic downturn; two, small-business self-employed borrowers in the '07 and '08 vintages; third, the impact of lender servicing and forbearance programs; and fourth, the number of paid claims and severity.

\*\*\*

These areas have been hit hard by depressed tourism particularly as the Australian dollar strengthened. Lower levels of consumer and

retail spending and reduce[d] housing demand driving home prices lower.

\*\*\*

Turning to slide 5, with deeper home price declines and higher average loan balances in Coastal Queensland when compared to the overall portfolio, our average paid claim on these properties is significantly higher than the overall portfolio and the number of claims we paid as well as the average claim increased significantly in the first quarter of 2012 as we worked with lenders to accelerate claim processing.

As shown on slide 6, the second driver of the reserve strengthening was a small business and self-employed borrower in the 2007 and 2008 vintages. This segment is more reliant on tourism, retail, and consumer spending including rental income, where these borrowers have investment properties.

The lower levels of tourism and retail spending have reduced income levels in this segment and combined with higher cost of living and mortgage payments due to higher interest rates, have created increased claims.

\*\*\*

During 2011, as delinquencies increased during the year, certain lender servicing routines fell behind which created processing delays and caused backlogs of delinquencies. In partnership with key lenders, we increased focus on default management and have seen a portion of these aged delinquencies come through in our first-quarter results.

\*\*\*

As shown slide 9, in the first quarter of 2012, both the number of claims and the average claim payment increased significantly as Genworth and key lenders increased focus on default management. As you can see, this was more concentrated in March, with a significant increase in the average claim paid as many of these claims also had higher loan balances. The observed increase in average claim size in March led us to conduct a comprehensive review of our delinquency inventory.

Now turning to slide 10, as a result of the loss experience we saw emerge in the first quarter, we felt it necessary and prudent to strengthen loss reserves. Loss reserves are management's best

estimate of ultimate paid claims for reported delinquencies including a provision for incurred but not recorded losses.

In the quarter, we supplemented our normal quarterly actuarial review process with an extensive loan by loan analysis of our delinquency inventory.

This analysis included obtaining more up-to-date property valuations for all delinquencies with adjustments to further stress the home price in foreclosure. This analysis formed the basis of the reserve strengthening of $82 million.

117.    Analysts on the May 2, 2012 1Q 12 earnings call struggled to understand how

Genworth could have made such an abrupt reversal on its reporting for the Australian MI unit:

**Geoffrey Dunn - Dowling & Partners Securities - Analyst**

First on Australia, kind of just a blunt question. From an oversight standpoint, is that something that needs to be revisited and revised? Is this something that should have been caught earlier or was it truly something that arose in March and corporate got it in the financial report in early April?

**Jerome Upton - Genworth Financial, Inc. - Global Mortgage Insurance CFO**

*In the second half of 2011, we did see increasing delinquency levels and we did observe lender processing delays.* We began to work more closely with those lenders to improve the collection and default management techniques. It did accelerate some of the older delinquencies coming through and as those came through in the first quarter, the claim paid counts did increase in January and February but it was – the March loss emergence and the average claims size, that really gave rise to our deep dive on the delinquency inventory and the extensive review that we undertook to strengthen loss reserves of $82 million.

## VIII.    CLASS ACTION ALLEGATIONS

118.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of Genworth's

securities between November 3, 2011 and April 17, 2012 inclusive and who were damaged when

the truth about Genworth's Australian MI unit was disclosed.  Excluded from the Class are

Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

119.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Genworth had more than 490 million shares of common stock outstanding that traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Genworth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

120.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

121.    Hialeah and New Bedford will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

122.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about Genworth's business, in particular the financial performance of its Australian MI unit during the Class Period, as well as the Company's operations and management;

(c)     whether the Defendants made their misstatements or misrepresentations with the required scienter; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

123.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

IX.     **APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE**

124.     Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

125.     Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding the Australian MI unit, the timing of the minority IPO of that unit, and the effect of an economic downturn in the Queensland region on that unit's delinquencies, claims, and loss reserves.

126.    Alternatively, Plaintiffs are entitled to a presumption of reliance under the fraud

on the market doctrine of the Defendants' material misrepresentations and omissions, because at

all relevant times, the market for Genworth's securities was an efficient market for the following

reasons, among others:

(a)    Genworth's stock met the requirements for listing, and was listed and

actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Genworth filed periodic public reports with the SEC

(and was eligible to file SEC Form S-1) and the NYSE;

(c)    Genworth regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

and

(d)    Genworth was followed by numerous investor research services that

published publicly available reports, as well as by several securities analysts (including Ed

Spehar and Scott Frost of Bank of America-Merrill Lynch; Mark Palmer of BTIG Research;

Jonathan Heller of Canyon Partners; Thomas Gallagher, David Motemaden, and Ryan Tunis of

Credit Suisse; Geoffrey Dunn and Ryan Krueger of Dowling & Partners; Donna Halverstadt of

Goldman Sachs; Jimmy S. Bhullar, Erik J Bass, and Matthew Byrnes of J.P. Morgan; Jeffrey

Schuman of Keefe, Bruyette & Woods, Inc.; Jeffrey Schuman of Keefe, Bruyette & Woods;

Nigel Dally and Hayley Locker of Morgan Stanley; Steven Schwartz of Raymond James;

Edward Shields, Paul Newsome, and John Barnidge of Sandler O'Neill Partners; Suneet Kamath

of Sanford Bernstein; Joanne Smith and Jeff Flynn of Scotia Capital; Andrew Kligerman, Julie

Oh, and Daniel Bergman of UBS Investment Research; and John Hall of Wells Fargo) at major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

127.    As a result of the foregoing, the market for Genworth's securities promptly digested current information regarding Genworth from all publicly available sources and reflected such information in Genworth's stock price.  Under these circumstances, all purchasers of Genworth's securities during the Class Period suffered similar injury through their purchase of Genworth's securities at artificially inflated prices and a presumption of reliance applies.

## X.    NO SAFE HARBOR

128.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, most of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding Genworth's practices.

129.    To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

130.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular

speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Genworth who knew that those statements were false when made.

## XI.    LOSS CAUSATION/ECONOMIC LOSS

131.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.

132.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Genworth's securities by misrepresenting that (1) the Australian MI unit was financially stable, with known risk areas effectively mitigated; and (2) the planned Australian IPO was on track, and failing to disclose that deteriorating economic conditions in the Queensland region had led to a significant increase in delinquencies and claims in excess of allotted reserves, which would force a delay of the IPO.

133.    The truth about Genworth's Australian MI unit was disclosed in a press release issued after the market closed on April 17, 2012 in which Defendants acknowledged that economic pressures in the Queensland region would force a delay in the IPO, and that the Australian MI unit would post its first recorded operating loss.  In response, Genworth's stock price plummeted *over 23%* in a single day on unusually heavy trading volume, with 75,351,400 shares traded compared with an average daily trading volume over the Class Period of 9,367,804 shares.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5(b)
### Promulgated Thereunder Against All Defendants

134.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

135.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Genworth's business, operations, management and the intrinsic value of Genworth's securities; and (ii) cause Plaintiff and other members of the Class to purchase securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

136.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Genworth's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

137.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the true business prospects of the Australian MI unit and the planned IPO of that unit during the Class Period, as specified herein.

138.   The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Genworth's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Genworth and the financial performance of its Australian MI unit in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Genworth's securities during the Class Period.

139.   Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading.

140.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true condition of Genworth's Australian MI unit from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by Defendants' misstatements of the financial performance of the Australian MI unit throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

141.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Genworth's securities was artificially inflated during the Class Period.  In ignorance of the fact that market price of Genworth's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Genworth's securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

142.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Genworth's Australian MI unit, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Genworth's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

143.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

144.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT II

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5(a) and (c)
Promulgated Thereunder Against All Defendants**

145.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

146.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

147.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of Genworth's

securities; and (iii) cause Plaintiffs to purchase Genworth's securities at artificially inflated prices.

148.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Genworth's securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

149.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Genworth's Australian MI unit and its planned IPO.

150.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which Genworth's securities traded.

151.    During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Genworth's securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

152.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Genworth's securities during the Class Period.

153.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class

for damages suffered in connection with their purchases of Genworth's securities during the Class Period.

## COUNT III

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

154.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

155.    The Individual Defendants acted as controlling persons of Genworth within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's core operations and/or intimate knowledge of the false statements filed by the Company with the SEC and otherwise disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding Genworth's Australian MI unit and its planned IPO prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

156.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

157.    As set forth above, Genworth violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as control persons of Genworth, the primary violator.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action and certifying Hialeah and New Bedford as class representative under Rule 23 of the Federal Rules of Civil Procedure and Robbins Geller Rudman & Dowd LLP, and Labaton Sucharow LLP, as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: April 17, 2015


**LABATON SUCHAROW LLP**


By: */s/ Jonathan Gardner*
Jonathan Gardner

Paul J. Scarlato
Angelina Nguyen
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
        pscarlato@labaton.com
        anguyen@labaton.com

*Attorneys for Lead Plaintiff New
Bedford Contributory Retirement System and
Lead Counsel for the Class*

Douglas R. Britton
Ashley M. Price
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, California 92101-8498
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Samuel H. Rudman
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

*Attorneys for Lead Plaintiff City of Hialeah
Employees' Retirement System and
Lead Counsel for the Class*

Stephen H. Cypen
**CYPEN & CYPEN**
777 Arthur Godfrey Road, Suite 320
Miami Beach, Florida 33140
Telephone: (305) 532-3200
Facsimile: (305) 535-0050

*Additional Counsel for the Class*

60

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 17, 2015.

*/s/ Jonathan Gardner*
Jonathan Gardner
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: 212/907-0800
212/818-0477 (fax)
E-mail: jgardner@labaton.com

**Mailing Information for a Case**

**1:14-cv-02392-AKH**

**Electronic Mail Notice List**

**The following are those who are currently on the list to receive e-mail notices for this case.**

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,
  drosenfeld@rgrdlaw.com
- **Jeffrey R. Alexander**
  jalexander@bftalaw.com
- **Douglas R. Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com
- **Greg A. Danilow**
  greg.danilow@weil.com,MCO.ECF@weil.com,robert.ruff@weil.com,
  Lauren.Engelmyer@weil.com,Larkin.Kittel@weil.com
- **Jonathan Gardner**
  jgardner@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,
  acarpio@labaton.com,electroniccasefiling@labaton.com,agreenbaum@labaton.com
- **Caroline Jane Hickey**
  caroline.hickeyzalka@weil.com,mco.ecf@weil.com,Layne.Behrens@weil.com
- **Angelina Nguyen**
  anguyen@labaton.com,electroniccasefiling@labaton.com
- **William Stephen Norton**
  bnorton@motleyrice.com,mkimpson@motleyrice.com,kweil@motleyrice.com
- **Ashley M. Price**
  APrice@rgrdlaw.com,susanw@rgrdlaw.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,
  e_file_sd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- ☐ (No manual recipients)