UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————— x

In re GENWORTH FINANCIAL, INC.　　:　Master File No. 1:14-cv-02392-AKH
SECURITIES LITIGATION　　　　　　　:
—————————————————————————　:　CLASS ACTION
　　　　　　　　　　　　　　　　　:
This Document Relates To:　　　　　　:　LEAD PLAINTIFFS' MEMORANDUM OF
　　　　　　　　　　　　　　　　　:　LAW IN SUPPORT OF MOTION FOR
　　　ALL ACTIONS.　　　　　　　　:　CLASS CERTIFICATION
————————————————————————— x

1112296_1

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.    FACTUAL BACKGROUND...................................................................2

III.    THE PROPOSED CLASS SATISFIES THE CLASS CERTIFICATION STANDARDS UNDER RULE 23 ...............................................................4

    A.    The Proposed Class Is so Numerous that Joinder of All Members Is Impracticable...................................................................5

    B.    There Are Questions of Law and Fact Common to the Members of the Proposed Class ...................................................................6

    C.    Lead Plaintiffs' Claims Are Typical of Those of the Class ....................................8

    D.    Lead Plaintiffs Will Fairly and Adequately Protect the Interests of the Class...................................................................9

    E.    The Court Should Appoint Lead Plaintiffs' Choice of Counsel as Class Counsel Under Rule 23(g) ...................................................................13

    F.    The Proposed Class Satisfies the Rule 23(b)(3) Requirements ...........................14

        1.    Common Questions of Law and Fact Predominate over Individual Questions...................................................................14

            a.    Issues of Reliance Will Not Predominate over Individual Issues...................................................................15

                (1)    Genworth Trading Volume Was High...............................18

                (2)    A Significant Number of Financial Analysts Covered and Reported on Genworth...................................18

                (3)    Genworth Securities Traded on the NYSE Under the Oversight of a Designated Market Maker with Brokers Standing Ready to Buy and Sell...........................19

                (4)    Genworth Was Eligible to File Form S-3 During the Class Period ...................................................................19

                (5)    The Price of Genworth Securities Reacted to New, Company-Specific Information During the Class Period ...................................................................19

- i -

**Page**

(6) Genworth Had a Large Market Capitalization During the Class Period ....................................................20

(7) The Relative Size of the Bid-Ask Spread for Genworth Common Stock Was Low ................................20

(8) Genworth Had a Large Float.............................................21

b. Defendants Cannot Rebut the Presumption of Reliance in This Case – Plaintiffs Allege that Defendants' Misrepresentations and Omissions Maintained the Artificial Inflation in the Price of Genworth Securities ..............................21

c. Class Members Are Also Presumed to Rely on Defendants' Omissions Under *Affiliated Ute* ....................................................24

2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action.................................................25

IV. CONCLUSION........................................................................................27

1112296_1

# TABLE OF AUTHORITIES

Page

## CASES

*Affiliated Ute Citizens v. United States,*
    406 U.S. 128 (1972) ................................................................................24, 25

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997) ................................................................................10, 25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    __U.S.__, 133 S. Ct. 1184 (2013) ................................................5, 14, 15, 16

*Anwar v. Fairfield Greenwich Ltd.,*
    306 F.R.D. 134 (S.D.N.Y. 2015) ................................................................24

*Baffa v. Donaldson,*
    222 F.3d 52 (2d. Cir. 2000) .........................................................................12

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ........................................................................... *passim*

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ..................................................... *passim*

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................... *passim*

*Cent. States Se. & Sw. Areas Health & Welfare Fund v.*
*Merck-Medco Managed Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007) ......................................................................5, 6

*Darquea v. Jarden Corp.,*
    No. 06 Civ. 722 (CLB), 2008 U.S. Dist. LEXIS 17747
    (S.D.N.Y. Mar. 6, 2008) ...........................................................................7, 10

*Dodona I, LLC v. Goldman, Sachs & Co.,*
    296 F.R.D. 261 (S.D.N.Y. 2014) ..............................................................24, 25

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ..................................................................................1, 23

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    563 U.S. 804, 131 S. Ct. 2179 (2011) ........................................................15

*Fogarazzo v. Lehman Bros.,*
    232 F.R.D. 176 (S.D.N.Y. 2005) ...............................................................24

**Page**

*Fogarazzo v. Lehman Bros.*,
   263 F.R.D. 90 (S.D.N.Y. 2009) ................................................................................5

*Green v. Wolf Corp.*,
   406 F.2d 291 (2d Cir. 1968)...........................................................................2, 27

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   __U.S.__, 134 S. Ct. 2398 (2014) ................................................................ *passim*

*In re Bank of Am. Corp. Sec.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) .............................................................................9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007),
   *aff'd in part and vacated in part on other grounds*,
   574 F.3d 29 (2d Cir. 2009)...................................................................6, 8, 26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)...........................................................................8

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   286 F.R.D. 226 (S.D.N.Y. 2012) .............................................................................5

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006).............................................................................4

*In re JPMorgan Chase & Co. Sec. Litig.*,
   No. 12 Civ. 03852 (GBD), 2015 U.S. Dist. LEXIS 132181
   (S.D.N.Y. Sept. 29, 2015)................................................................ *passim*

*In re Livent Noteholders Sec. Litig.*,
   210 F.R.D. 512 (S.D.N.Y. 2002) ...........................................................................12

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953
   (S.D.N.Y. Dec. 23, 2009)...........................................................................26

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ...................................................................1, 5, 6, 9

*In re Sadia*,
   269 F.R.D. 298 (S.D.N.Y. 2010) ...........................................................................23

**Page**

*In re SCOR Holding (Switz.) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)....................................................................26

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)..............................................................................4

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) .................................................................6, 8, 9

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)...............................................................23

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .....................................................................18

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .....................................................................24

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    No. 12-cv-9350 (VM), 2015 U.S. Dist. LEXIS 162101
    (S.D.N.Y. Dec. 2, 2015)...................................................................................13

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .........................................................17, 20, 21

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .....................................................................23

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014)...................................................6, 17, 21, 23

*Ret. Sys. v. Morgan Stanley & Co.*,
    772 F.3d 111 (2d Cir. 2014)................................................................................5

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
    284 F.R.D. 173 (S.D.N.Y. 2012) .....................................................................23

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)..............................................................................14

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)................................................................................8

Page

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001) ................................................................................9

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ......................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338, 131 S. Ct. 2541 (2011) ................................................................8

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b) ..............................................................................................................2, 9
   §78t(a) ..............................................................................................................2, 9

Federal Rules of Civil Procedure
   Rule 23 ......................................................................................................... *passim*
   Rule 23(a) .................................................................................................... *passim*
   Rule 23(a)(1) ......................................................................................................5, 6
   Rule 23(a)(2) ......................................................................................................6, 8
   Rule 23(a)(3) ......................................................................................................8, 9
   Rule 23(a)(4) ............................................................................................9, 13, 14
   Rule 23(b) ........................................................................................................4, 14
   Rule 23(b)(3) ............................................................................................... *passim*
   Rule 23(c) ............................................................................................................27
   Rule 23(d) ............................................................................................................27
   Rule 23(g) ....................................................................................................13, 14
   Rule 23(g)(1)(A) .................................................................................................13
   Rule 23(g)(4) .......................................................................................................13

17 C.F.R.
   §240.10b-5 ................................................................................................2, 9, 15

Lead Plaintiffs City of Hialeah Employees' Retirement System ("Hialeah") and New Bedford Contributory Retirement System ("New Bedford") (collectively, "Lead Plaintiffs" or "Proposed Class Representatives"), by their undersigned attorneys, respectfully submit this memorandum of law in support of Lead Plaintiffs' Motion for Class Certification.  The proposed Class is defined as:

> [A]ll purchasers of publicly traded Genworth securities between November 3, 2011 and April 17, 2012 inclusive and who were damaged when the truth about Genworth's Australian MI unit was disclosed.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.[1]

Lead Plaintiffs respectfully request that pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, the Court: (a) certify this case as a class action; (b) appoint Lead Plaintiffs as Class Representatives; and (c) approve the firms of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Labaton Sucharow LLP ("Labaton Sucharow") as Class Counsel.

## I.   PRELIMINARY STATEMENT

Courts in this Circuit "'have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws.'"  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("securities statutes seek to maintain public confidence in the marketplace . . . by deterring fraud, in part, through the availability of private securities fraud actions").[2]  Moreover, "[t]he Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification."  *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 U.S. Dist. LEXIS 132181, at *9 (S.D.N.Y. Sept. 29, 2015) ("'[I]f there is to be an error made, let it be in favor

---

[1]   *See* ¶118.  All "¶__" or "¶¶__" references are to the Second Amended Class Action Complaint (Dkt. No. 42) ("Complaint").  "Defendants" are defined as Genworth Financial, Inc. ("Genworth" or the "Company"), Michael D. Fraizer and Martin P. Klein.

[2]   Citations and footnotes are omitted and emphasis is added unless otherwise specified.

and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.'") (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968)).

Class certification is particularly appropriate in this securities fraud action because there are numerous factual and legal questions common to all members of the proposed Class that relate to Defendants' materially false and misleading statements and/or omissions throughout the Class Period.[3]  Because these common questions predominate over any individualized questions that may exist and because the numerous Class members make individualized actions impractical, proceeding as a class action is the superior means of fairly and efficiently adjudicating these issues.  Moreover, Lead Plaintiffs' claims are typical of the other Class members' claims and, through the Court-appointed Lead Counsel, Lead Plaintiffs have thus far successfully prosecuted this action.

This Court upheld the Complaint alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) on June 16, 2015.  *See* Dkt. No. 53 (Order Denying Motion to Dismiss).  As established below, this action satisfies the requirements for class certification under Rule 23.  Accordingly, Lead Plaintiffs request that the Court certify the Class, appoint Lead Plaintiffs as Class Representatives, and appoint Robbins Geller and Labaton Sucharow as Class Counsel.

## II.    FACTUAL BACKGROUND

Throughout the Class Period, Defendants made misrepresentations and omissions about the strength of Genworth's Australian mortgage insurance ("MI") subsidiary and the Australian housing market in advance of a minority share initial public offering of that Australian MI unit (the "IPO"), which was necessary to transfer as much as $720 million in capital from that unit to other Genworth

---

[3]    "Class Period" refers to November 3, 2011 through April 17, 2012, inclusive.  *See* ¶1.

units – particularly its floundering U.S. MI unit which had been operating at a loss for years.  ¶¶4-14, 46.  Defendants represented that the IPO was "on track" for the second quarter of 2012 ("2Q12") and would occur "from a position of strength" based on the Australian MI unit's purported stability and the robustness of Genworth's risk management procedures.  ¶¶11-15, 58, 96, 104, 106.  In truth and unbeknownst to Genworth's investors, the Australian MI unit suffered massive exposure to low-documentation loans susceptible to income manipulation.   The January 2011 flood events in Queensland, as well as other pressures to the Australian housing market, had destabilized the low-documentation loans approved in 2007 and 2008.  ¶¶16, 21, 77, 81.  At the same time, Defendants were assuring investors that the Australian MI unit was "absorbing the loss pressures."  ¶¶12, 49, 91.  Genworth's exposures resulted in a sharp increase in delinquencies and claims on the high-risk, low-documentation loans insured in 2007 and 2008, and from the Queensland region, beginning before and continuing during the Class Period.  ¶¶16-17, 21, 59-75.  This worsening delinquency trend was evidenced in an internal meeting in late 2011, which featured a PowerPoint presentation showing an increase in claims for the Australia MI unit in the amount of $100-$125 million.  ¶¶18, 65.

While repeatedly representing to investors that the strength of Genworth's Australia MI unit and risk management procedures would allow the IPO to go forward as planned in 2Q12 to "free material capital for redeployment," Defendants hid from investors the massive losses Genworth was experiencing and the increased reserves required as a result of its exposure to the deteriorating high-risk, low-documentation loans.  ¶¶17-18, 45, 59-75.  When the truth came out on April 17, 2012 that Genworth had to delay the IPO due to the "elevated loss experience in Australia" resulting from increased delinquencies and claims, "particularly in coastal areas of Queensland that experienced natural catastrophes . . . and among certain groups of small business owners and self-employed borrowers," the market was stunned and analysts were "surprised" as the stock price dropped 24% in

a single day on heavy trading.  ¶¶17, 21-24, 109-114.  On May 2, 2012, Defendants confirmed the magnitude and reason for Genworth's "higher losses" as "primarily due to loss reserve strengthening of $82 million before taxes or $53 million after tax" and driven by the "Queensland economic downturn" and "small-business self-employed borrowers in the '07 and '08 vintages." ¶¶116-117.

## III.   THE PROPOSED CLASS SATISFIES THE CLASS CERTIFICATION STANDARDS UNDER RULE 23

"To be certified, a putative class must demonstrate that it satisfies all four of the requirements of Rule 23(a) and one of the categories of Rule 23(b) of the Federal Rules of Civil Procedure." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 73 (S.D.N.Y. 2015).[4] In determining whether a class should be certified, the question is not whether plaintiffs will prevail on the merits, but rather whether the requirements of Rule 23 have been met.  *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) (instructing district courts to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met," but  cautioning against "assess[ing] any aspect of the merits unrelated to a Rule 23 requirement"); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("The question for the district court at the class certification stage is whether plaintiffs' . . . evidence is sufficient to demonstrate common questions of fact warranting certification of the

---

[4]    Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> > (2) there are questions of law or fact common to the class;
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> > (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Once a court determines that the Rule 23(a) requirements have been met, it may grant class certification if the plaintiff demonstrates that it can satisfy Rule 23(b)(3) such that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

proposed class, not whether the evidence will ultimately be persuasive."); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __U.S.__, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). The Court must conduct a "rigorous analysis" of the Rule 23 requirements. *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 232 (S.D.N.Y. 2012).

As demonstrated below, the Proposed Class Representatives satisfy all of the prerequisites of Rule 23(a) as well as the requirements of Rule 23(b)(3). Accordingly, class certification is appropriate and this motion should be granted in its entirety.

### A.    The Proposed Class Is so Numerous that Joinder of All Members Is Impracticable

Class certification is appropriate where the proposed class is so numerous that joinder of all its individual members would be impracticable. *See* Fed. R. Civ. P. 23(a)(1); *NYSE Specialists*, 260 F.R.D. at 69-70. "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007)). As the Second Circuit has held, "'[n]umerosity is presumed for classes larger than forty members.'" *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *9 (quoting *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014)). Moreover, "'"[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."'" *Id*. at *9-*10.

The Class in this case easily meets the numerosity requirement. As Defendants admit, during the Class Period, Genworth had over 490 million shares of common stock outstanding and traded on

- 5 -

the New York Stock Exchange ("NYSE") with an average daily trading volume of over 9.3 million shares. Ex. 1, Response Nos. 15, 19, 24.[5]  Defendants also admit that "more than 1,000 Persons or entities purchased common stock of Genworth on the open market" during the Class Period.  *Id*., Response No. 2.  In reality, and based on the millions of Genworth securities that were outstanding and traded during the Class Period, the proposed Class is likely comprised of thousands of geographically dispersed persons or entities – making joinder highly difficult, inefficient, and thus impracticable.  *See* Fed. R. Civ. P. 23(a)(1); *see, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (holding that a proposed class comprised of purchasers of shares of common stock, call options and put options of a company with over 32.9 million shares outstanding and an average weekly trading volume of ~6 million shares satisfied numerosity).  Accordingly, the numerosity requirement of Rule 23(a)(1) is satisfied here.

### B.      There Are Questions of Law and Fact Common to the Members of the Proposed Class

The commonality requirement of Rule 23(a)(2) "'is met if plaintiffs' grievances share a common question of law or of fact.'"  *Merck-Medco*, 504 F.3d at 245.  This does not mean that all issues must be identical as to each class member.  Rather, it requires plaintiffs simply to "'"identify some unifying thread among the members' claims that warrants class treatment."'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007), *aff'd in part and vacated in part on other grounds*, 574 F.3d 29 (2d Cir. 2009).  "'Even a single common legal or factual question will suffice.'"  *NYSE Specialists*, 260 F.R.D. at 70.  Thus, commonality "'is a "low hurdle,"'"  *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *10, and "'has been applied permissively' in securities fraud litigation."  *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y.

---

[5]      "Ex. __" references refer to the exhibits attached to the Declaration of Douglas R. Britton ("Britton Decl.") filed concurrently herewith.

- 6 -

2007).  "In securities fraud suits, the requirement is met when 'plaintiffs allege that class members have been injured by similar material misrepresentations and omissions.'"  *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *10-*11.

Common questions of law and fact are present where, as here, the alleged fraud involves material misrepresentations and omissions in press releases, SEC filings and statements to the investing public.  *See, e.g.*, *Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB), 2008 U.S. Dist. LEXIS 17747, at *6 (S.D.N.Y. Mar. 6, 2008) ("The alleged misrepresentation leading to artificially inflated stock prices relate to all the investors and the existence and materiality of such misstatements or omissions present important common issues.").  Virtually all of the questions of law or fact in this case are common to Lead Plaintiffs and the absent Class members, including:

- Whether Defendants' acts and omissions violated the federal securities laws;

- Whether Defendants' statements to investors during the Class Period misrepresented material facts about the health of Genworth's Australian MI unit and Defendants' ability to execute the IPO in 2Q12;

- Whether Defendants omitted material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading;

- Whether Defendants acted knowingly or recklessly in misrepresenting material facts;

- Whether the price of Genworth securities was artificially inflated during the Class Period;

- Whether investors suffered damages when the artificial inflation in the price of Genworth securities, created or maintained by Defendants' false or misleading statements, was eliminated; and

- To what extent the members of the Class have sustained damages and the proper measure of damages.

In similar circumstances, courts in this District have found the commonality requirement met. *See, e.g.*, *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *11 ("[A]lleg[ing] that . . . all members of the Proposed Class were injured by the same misstatements . . . satisfie[s] the commonality

- 7 -

requirement."); *Flag Telecom*, 245 F.R.D. at 158 (finding commonality satisfied where common questions of fact and law included "whether defendants violated the federal securities law by the acts and conduct," "whether [defendants] issued false and misleading statements . . . during the Class Period," "whether defendants acted with the requisite scienter," and "whether the market price of [the company's] securities was artificially inflated or distorted during the Class Period as a result of defendants' conduct"); *Vivendi*, 242 F.R.D. at 84 (same).

This Court already sustained the Complaint's allegations and upheld the sufficiency of the alleged misstatements and omissions therein. *See* Dkt. No. 53. Evidentiary proof of those claims will necessarily be common to all members of the proposed Class. If each member pursued their claims individually, they would each have to prove identical facts and address identical legal issues. Accordingly, the proposed Class satisfies Rule 23(a)(2)'s commonality requirement.

## C.      Lead Plaintiffs' Claims Are Typical of Those of the Class

The typicality requirement of Rule 23(a)(3) is met where "'"each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."'"[6] *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *11 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). This "requirement is "'not demanding."'" *Id.* "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). In securities class actions where "plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading

---

[6]      The "'commonality and typicality requirements of Rule 23(a) tend to merge.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2551 n.5 (2011). Thus, typicality is established if commonality is shown.

statements underlying their claims," the claims and nature of evidence "are generally considered sufficient to satisfy the typicality requirement."  *Vivendi*, 242 F.R.D. at 85.

Here, Lead Plaintiffs' claims are typical of the other Class members as they "'arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"  *NYSE Specialists*, 260 F.R.D. at 70 (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).  Lead Plaintiffs allege that Defendants violated Exchange Act §§10(b) and 20(a), as well as Rule 10b-5, by issuing public statements and documents that misrepresented and/or omitted material facts to all investors alike.  ¶¶89-108.  Lead Plaintiffs also allege that, like the other Class members, their Genworth securities were purchased at artificially inflated prices as a result of Defendants' material misrepresentations and omissions. When those misrepresentations and omissions were disclosed and became apparent to the market, all Class members were damaged as artificial inflation came out of the price of Genworth securities. ¶¶109-117.  Thus, Lead Plaintiffs suffered harms typical of those of the Class for which they seek full redress.  *See In re Bank of Am. Corp. Sec.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) (finding typicality where the proposed class representatives "acquired [the company's] securities at prices allegedly inflated by defendants' misstatements and/or omissions, and have an interest in maximizing their recovery").  Given these uniform misrepresentations and omissions, the claims for which will be proven by common evidence, the typicality requirement of Rule 23(a)(3) is satisfied.

### D.   Lead Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The adequacy requirement of Rule 23(a)(4) demands that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To satisfy this requirement, "'the class representatives must not have interests conflicting with the class, and the

lead plaintiffs' counsel must be "qualified, experienced, and generally able to conduct the proposed litigation."'" *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *11.

The Proposed Class Representatives have already successfully represented the interests of the Class and demonstrated their adequacy, assertiveness, and commitment to vigorously prosecute this action.[7]  As an initial matter, the interests of Hialeah and New Bedford are perfectly aligned with the Class they seek to represent – both purchased thousands of shares of Genworth securities during the Class Period at prices artificially inflated by Defendants' misrepresentations and omissions and were damaged when Defendants disclosed the truth about Genworth's financial condition and the status of the IPO.  As discussed above, all Class members allege claims arising from the same wrongful conduct that are based on the same legal theories as Lead Plaintiffs' claims.  *See Darquea*, 2008 U.S. Dist. LEXIS 17747, at *9 ("All claims alleged arise from the same wrongful conduct, and thus, Plaintiff's interests, recouping money invested, are similar to those of the proposed class.  As such, named Plaintiffs will fairly and adequately protect the interests of the class.").

At the same time, both Hialeah and New Bedford have actively supervised and monitored the progress of this litigation.  Each carefully considered whether to pursue the litigation as well as their role as Lead Plaintiff in discussions with their boards about their losses in Genworth securities. Ex. 2 at 117:2-118:7 (testifying to Hialeah's $70,000 loss and recognizing that "we have a high probability of winning [the] case if we would put in the effort to pursue the case"); Ex. 3 at 142:21-143:11 (testifying that "our losses sustained were $62,000, and that was sufficient for us to request that we need a lead counsel, a lead litigator").  Furthermore, each spent significant time collecting

---

[7]   As the Supreme Court has noted, "[t]he adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'  The adequacy heading also factors in competency and conflicts of class counsel." *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

and working with Lead Counsel to cumulatively produce thousands of pages of documents relevant to the litigation, including e-mails, investment records and reports, investment policies, agreements and contracts, board minutes and audio recording of board minutes. Each also reviewed and verified the responses to the interrogatories served on them, as well as other documents relevant to the case. Exs. 4-5; Ex. 2 at 47:13-20 (testifying that he reviewed documents "[m]ultiple times" "[l]ots of documents, some stuff I took home and reviewed"); Ex. 3 at 160:24-161:9 (testifying that he reviewed the motions to dismiss and Lead Plaintiffs' responses to the motions).

Each Lead Plaintiff also made a representative available for full-day depositions and the testimony from each representative further supports a finding of adequacy. In fact, both representatives recognized their duties as steward of the litigation on behalf of the Class. Hialeah's representative, Robert Williams, III, testified that "the obligations of a lead plaintiff in a securities litigation" included "[t]o be involved with the process from the beginning to the end," meaning to "[b]e involved in decision making and as of what we are today, depositions or possible court appearances." Ex. 2 at 114:17-24; *see also id.* at 121:25-122:15 (testifying that as lead plaintiff "we're taking a lead role through the process" and "as lead plaintiff we would be representing anybody else that would fall within the case"). New Bedford's representative, Gerard Arnaudet, testified to New Bedford's understanding that it is "acting as a fiduciary for the class as a whole. We have the oversight to monitor what counsel is doing and to recover whatever we can for the class as a whole, and for ourselves and our proportionate share." Ex. 3 at 143:13-23. Mr. Arnaudet also testified that regarding Lead Plaintiffs' role in the litigation, "we will have oversight over the progress that the counsel makes. We will monitor their progress and make a determination as co-Plaintiffs here as to whether or not the action should move further based on the actions that are taken what we determine to be in the best interest of the class." *Id.* at 157:10-21.

- 11 -

1112296_1

Each Lead Plaintiff clearly understands its role and responsibilities, and has been actively fulfilling its role and responsibilities in this case.  Indeed, each representative's understanding of the case further demonstrates their ability to make decisions on behalf of the Class regarding the litigation.  Ex. 2 at 133:12-134:3 (Mr. Williams testified that "I believe they omitted the information that the bad loans were going to cause the prevention of the IPO . . . the bad loans that were happening, the default in the loans were happening in Australia prevented the planned IPO."); Ex. 3 at 152:19-23 (Mr. Arnaudet testified that "there were material – non-disclosures made regarding the Australian IPO, which basically ourselves, Hialeah, and other investors sustained losses based on the non-disclosure.").  Hialeah and New Bedford have thus actively participated in the prosecution to date, and understand the case and their roles as Lead Plaintiffs.  This active oversight will continue should they be appointed as Class Representatives.  Lead Plaintiffs are committed to vigorously prosecuting this action and will "fairly and adequately protect the interests of the Class."

Lead Plaintiffs are also represented by competent Lead Counsel that are "qualified, experienced and able to conduct the litigation."  *Baffa v. Donaldson*, 222 F.3d 52, 60 (2d. Cir. 2000).  Representation is adequate when counsel for the class is qualified and competent and the interests of the representative are not antagonistic to those of absent class members.  *Id*.  Here, Lead Counsel possess extensive experience litigating securities class actions in this District and other districts and have successfully prosecuted numerous securities class actions on behalf of injured investors.  *See* Ex. 6 (Firm Résumé of Robbins Geller); Ex. 7 (Firm Résumé of Labaton Sucharow).  Lead Counsel have also done so in this case – engaging in an extensive investigation into the merits of the case, successfully opposing Defendants' motion to dismiss, and litigating vigorously against determined defense counsel.  Both Robbins Geller and Labaton Sucharow are undoubtedly qualified, experienced and capable of prosecuting this litigation on behalf of the Class.  *See In re Livent*

- 12 -

*Noteholders Sec. Litig.*, 210 F.R.D. 512, 517 (S.D.N.Y. 2002) (finding co-lead counsel adequate pursuant to Rule 23(a)(4) where no conflicts of interest were identified and counsel's "performance in this matter indicates to the Court that they are competent and capable of representing the putative class members vigorously and effectively").  Given the clear adequacy of Lead Plaintiffs and their chosen counsel, Rule 23(a)(4) is satisfied.

> **E.     The Court Should Appoint Lead Plaintiffs' Choice of Counsel as Class Counsel Under Rule 23(g)**

In addition to satisfying the adequacy prong of Rule 23(a)(4), consideration of Rule 23(g) supports the appointment of Robbins Geller and Labaton Sucharow as Class Counsel.  Under Rule 23(g)(4), the Court must appoint counsel who will fairly and adequately represent the Class.  And in appointing Class Counsel, Rule 23(g)(1)(A) requires the Court to consider

> "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."

*Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12-cv-9350 (VM), 2015 U.S. Dist. LEXIS 162101, at *26-*27 (S.D.N.Y. Dec. 2, 2015).  Because "the Private Securities Litigation Reform Act ('PSLRA') instructs that a lead plaintiff 'shall, subject to the approval of the court, select and retain counsel to represent the class,'" there is "'a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention.'"  *Id.* at *27.

As discussed in the preceding section, both Robbins Geller and Labaton Sucharow have demonstrated their ability to prosecute claims on behalf of each Lead Plaintiff and Class members and will continue to do so.  Both firms have proven their willingness to commit substantial time and resources to representing the Class in this action and have uncovered significant evidence in support of the Class' claims.  Moreover, they both have extensive experience in prosecuting and successfully

resolving complex securities class actions in courts in this District and throughout the United States, and thus are extremely knowledgeable of the complexities of the applicable law.  *See* Exs. 6-7.  The demonstrated competence of Lead Counsel to fairly and adequately represent the interests of the Class further leads to the conclusion that the requirements of Rule 23(a)(4) and Rule 23(g) have been met and that Lead Plaintiffs' choice of counsel should be appointed as Class Counsel.

**F.      The Proposed Class Satisfies the Rule 23(b)(3) Requirements**

**1.      Common Questions of Law and Fact Predominate over Individual Questions**

In addition to satisfying Rule 23(a)'s requirements, a plaintiff seeking certification must satisfy one of the requirements of Rule 23(b).  Under Rule 23(b)(3), a court can certify the class if it finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  A plaintiff satisfies the predominance requirement "'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).[8]

Here, common questions will clearly predominate over any issues that affect only individual members.  The Supreme Court itself has recognized that the type of issues involved here, including whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, scienter, falsity and materiality) and whether the revelation(s) of the alleged fraud

---

[8]      The law is "'well-established' in this Circuit that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)."  *Id.*; *see also Amgen*, 133 S. Ct. at 1196-97, 1200 ("Rule 23(b)(3), however, does ***not*** require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'") (emphasis in original).

- 14 -

proximately caused the price of that company's securities to decline (*i.e.*, loss causation), involve common questions of law and fact that predominate over individualized ones. *See Amgen*, 133 S. Ct. at 1196-97, 1200; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2186 (2011). And since Lead Plaintiffs will prove damages in the same way as all Class members (*i.e.*, through an out-of-pocket damages methodology), and will, as discussed below, prove reliance through the fraud-on-the-market presumption permitted by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988) (the "*Basic* presumption"), as recently affirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, __U.S.__, 134 S. Ct. 2398 (2014) ("*Halliburton II*"), there are no individual issues to threaten the overwhelming number of issues common to the Class. Accordingly, the predominance requirement is satisfied.

### a.  Issues of Reliance Will Not Predominate over Individual Issues

As courts in this Circuit have recognized, "[d]efendants opposing class certification often challenge plaintiffs' claim of reliance." *Barclays*, 310 F.R.D. at 74. And they have done so recently as a matter of course. But the Supreme Court's recent decision in *Halliburton II* changed the landscape, shifting the burden to prove a complete absence of "price impact" to defendants once plaintiffs make a preliminary showing necessary to invoke the *Basic* presumption. 134 S. Ct. at 2408. That presumption "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" and recognizes that whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Id.* (quoting *Basic*, 485 U.S. at 246-47). To demonstrate that the *Basic* presumption applies for purposes of class certification, a plaintiff need only show that (1) the alleged misrepresentations were publicly

known, (2) the securities traded in an efficient market, and (3) the investor traded securities between the time the misrepresentations were made and when the truth was revealed.  *Id.* at 2408.[9]

Defendants cannot reasonably dispute that Lead Plaintiffs satisfy these threshold requirements.  They admit that their statements were publicly known and cannot dispute that Lead Plaintiffs purchased Genworth securities between the time the misrepresentations were made and the truth was revealed.[10]  Additionally, market efficiency is a non-issue.  Genworth securities traded on the NYSE, with an average daily trading volume of over 9.3 million shares and a following of at least 12 analysts, all of which support a presumption of market efficiency for class certification.[11]  As Judge Scheindlin explained in *Barclays*, "[i]n most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification."  310 F.R.D. at 84 & n.95 (collecting cases).  After all, the *Basic* presumption is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"  *Halliburton II*, 134 S. Ct. at 2410.  And that premise is certainly applicable in this case, with Defendants announcing material statements about the strength of Genworth's Australian business and the likelihood of an IPO that

---

[9]     While materiality is a requirement for the *Basic* presumption, the Supreme Court in *Halliburton II* reiterated that materiality need not be proven at class certification and upheld its holding in *Amgen* that materiality "should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)."  *Id.* at 2416; *see also id.* at 2412 ("The burden of proving those prerequisites [for invoking the *Basic* presumption] still rests with plaintiffs and (with the exception of materiality) must be satisfied before class certification.").

[10]    *See* Ex. 1, Response Nos. 29, 32 (admitting that "Genworth announced and disseminated [its financial results] to multiple outlets" and "disseminated certain information to investors through press releases, periodic filings with the SEC, conference calls and other public disclosures, including during the time period between November 3, 2011 and April 17, 2012"); Dkt. No. 11-1 (certifying that Genworth securities were purchased by Hialeah on February 22, 2012 and March 21, 2012 and by New Bedford on February 17, 2012 and February 21, 2012).

[11]    *See* Ex. 1, Response Nos. 15, 19, 25 (admitting that "Genworth's common stock traded on the New York Stock Exchange ('NYSE') throughout the Class Period," that "the average daily trading volume for Genworth common stock during the Class Period was approximately 9,368,213.04 shares," and that "there are reports in the public domain regarding Genworth published by at least twelve sources").

would infuse Genworth with critically needed capital.  Any dispute that these statements affected the price of Genworth securities is not only unreasonable, it defies reality.

Even without the *Basic* presumption, Lead Plaintiffs meet the required standards.  In fact, they satisfy every factor that courts in this District "'routinely' apply" in evaluating the efficiency of equity markets – those "first articulated" in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and "the three additional factors laid out" in *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001).  *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *17.  The *Cammer* factors are:

> "(1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases."

*McIntire*, 38 F. Supp. 3d at 431.  The *Krogman* factors are: "'(1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders.'" *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *17.

In support of their motion, Lead Plaintiffs submit the expert declaration of Dr. Steven Feinstein, a Finance Professor at Babson College and an expert in the financial markets.  He performed analyses to test whether Genworth common stock traded in an efficient market during the Class Period and has rendered an opinion on market efficiency in this case, concluding that the market for Genworth common stock was efficient during the Class Period.  *See* Declaration of Steven P. Feinstein, Ph.D., CFA ("Feinstein Decl.") filed herewith, ¶¶1, 3, 17-19.  He analyzed Genworth common stock under the *Cammer* and *Krogman* factors and determined that each one supported a finding of market efficiency.  *Id.*, ¶¶44-85.  In addition, with support in the academic literature, he performed his own statistical analysis to determine if Genworth's stock price reacted in

- 17 -

an efficient manner when Defendants released important information. *Id.*, ¶¶86-168.  Based on a thoroughly conducted event study, he determined that there was a cause-and-effect relationship between new material information and appropriate movements in Genworth's stock price and that Genworth stock traded in an efficient market. *Id.*, ¶¶18-19, 150-151, 165, 168, 175-176.  His event study methodology is also fully capable of adequately calculating damages on a class-wide basis at a later stage of the litigation and his declaration sets forth that methodology. *Id.*, ¶¶20, 169-172, 177.

### (1)  Genworth Trading Volume Was High

The trading volume in this case far exceeds what the *Cammer* court held weighed strongly in favor of efficiency.  During the Class Period, Genworth's average daily trading volume was approximately 9.4 million shares and it experienced a weekly turnover of 9.54% of its outstanding shares – over four times higher than that in *Cammer*. *See* Ex. 1, Response No. 19; Feinstein Decl., ¶¶45-47; *Barclays*, 310 F.R.D. at 79 ("*Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency . . . .").  This trading volume thus supports a finding of efficiency.

### (2)  A Significant Number of Financial Analysts Covered and Reported on Genworth

At least 12 firms covered Genworth during the Class Period, further demonstrating efficiency in this case. *See* Ex. 1, Response No. 25; Feinstein Decl., ¶¶48-52.  Their presence indicates that the market for Genworth securities "is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors." *Barclays*, 310 F.R.D. at 79; *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (finding efficiency where three analysts followed security).

> **(3)    Genworth Securities Traded on the NYSE Under the Oversight of a Designated Market Maker with Brokers Standing Ready to Buy and Sell**

The existence of a large number of market makers also demonstrates efficiency in this case. Genworth common stock was traded on the NYSE – one of the most renowned, liquid, and efficient forums for trading in the world – by a highly developed network of brokers overseen by the NYSE-designated market maker.  *See* Feinstein Decl., ¶¶58-64.  There were at least 123 active market makers for Genworth common stock during the Class Period, far exceeding the number of market makers that the *Cammer* court found worthy of a "substantial presumption" of efficiency.  *Id.*, ¶¶63-64; *Cammer*, 711 F. Supp. at 1293 ("'Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one . . . .'").  This is strong evidence that Genworth common stock traded efficiently throughout the Class Period.

> **(4)    Genworth Was Eligible to File Form S-3 During the Class Period**

Form S-3 eligibility also demonstrates efficiency.  Genworth, of course, was eligible to file this simplified form at all times throughout the Class Period and had even filed a Form S-3 Registration Statement just after the Class Period.  *See* Feinstein Decl., ¶¶71-73.  "The SEC permits a company to file Form S-3 [only] when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information."  *Barclays*, 310 F.R.D. at 79.  Since "the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient," Genworth's eligibility is strong evidence of efficiency.  *Cammer*, 711 F. Supp. at 1285.

> **(5)    The Price of Genworth Securities Reacted to New, Company-Specific Information During the Class Period**

The final *Cammer* factor – a cause-and-effect relationship between the release of unexpected company-specific information and the price reaction of Genworth common stock – also

- 19 -

demonstrates efficiency.  Although the usefulness of this factor has been diminished by the Supreme

Court's view that "[d]ebates about the precise *degree* to which stock prices accurately reflect public

information are . . . largely beside the point" (*Halliburton II*, 134 S. Ct. at 2410 (emphasis in

original)), in this case, Genworth's stock price quickly responded to the release of new Company-

specific "unexpected" news events.  *Cammer*, 711 F. Supp. at 1287.  Genworth's stock price jumped

significantly during each earnings announcement during the Class Period (15.46% for the 3Q11

announcement and 13.15% for the 4Q11 announcement), and then collapsed 27.14% in response to

Genworth's announcement disclosing the truth on the last day of the Class Period.  *See* Feinstein

Decl., ¶¶141, 144, 148.  The immediate stock price reactions to unexpected news in Genworth's

public disclosures support the conclusion that Genworth common stock traded in an efficient market.

### (6)   Genworth Had a Large Market Capitalization During the Class Period

A large market capitalization weighs in favor of finding market efficiency.  *Barclays*, 310

F.R.D. at 92 (citing *Krogman*, 202 F.R.D. at 478).  During the Class Period, Genworth's market

capitalization averaged $3.76 billion, meaning that Genworth was larger than at least 80% of all

other publicly traded companies in the United States.  Feinstein Decl., ¶¶75-76.  Genworth's large

market capitalization indicates that its common stock traded efficiently.

### (7)   The Relative Size of the Bid-Ask Spread for Genworth Common Stock Was Low

A small bid-ask spread indicates an efficient market for a security.  *Barclays*, 310 F.R.D. at

93 (citing *Krogman*, 202 F.R.D. at 478).  According to Professor Feinstein, the "average bid-ask

spread for Genworth common stock over the course of the Class Period was 0.13%."  Feinstein

Decl., ¶82.  That is substantially narrower than the average month-end bid-ask spread over the

course of the Class Period, which for all stocks in the CRSP database was 0.73%. *See id.* The bid-ask spread also weighs in favor of market efficiency.

### (8)    Genworth Had a Large Float

A high percentage of shares available to the public are also indicative of market efficiency. *Barclays*, 310 F.R.D. at 93 (citing *Krogman*, 202 F.R.D. at 478). During the Class Period, Genworth common stock float averaged $3.75 billion, larger than the total market capitalization of at least 80% of all other publicly traded companies in the United States. Feinstein Decl., ¶¶70, 77-79. This factor therefore also weighs in favor of a finding of market efficiency.

In sum, each of the five *Cammer* factors and the three *Krogman* factors indicate that Genworth common stock traded in an efficient market during the Class Period.[12]

### b.    Defendants Cannot Rebut the Presumption of Reliance in This Case – Plaintiffs Allege that Defendants' Misrepresentations and Omissions Maintained the Artificial Inflation in the Price of Genworth Securities

As discussed above, the Supreme Court's *Halliburton II* opinion changed the landscape at class certification in securities actions seeking certification under Rule 23(b)(3). What traditionally had morphed into a highly technical analysis requiring plaintiffs to pinpoint rapid movements in an issuer's stock price through complicated event studies (with defendants challenging plaintiffs' showing even for stocks trading on the most efficient markets), has now turned into a threshold showing by plaintiffs followed by a shift in burden. Once plaintiffs make their showing, establishing the fraud-on-the-market presumption, it becomes defendants' burden to rebut the presumption. *Halliburton II*, 134 S. Ct. at 2416-17. And that burden is heavy. Defendants must provide ***direct***

---

[12]    That the proposed Class includes options traders does not preclude application of the *Basic* presumption because the market for Genworth common stock was efficient during the Class Period, and there are no "'special circumstances compelling a different result.'" *McIntire*, 38 F. Supp. 3d at 433-34 (holding that "[i]n general, '[t]he market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that price,'" thus "where a court finds the Market Efficiency Requirement satisfied, '[o]ption traders . . . may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result'").

evidence that "definitively demonstrate[s] *lack* of price impact" by """"sever[ing] the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff."""" *Barclays*, 310 F.R.D. at 95 (quoting *Halliburton II*, 134 S. Ct. at 2415-16).   As Justice Ginsburg explained in her concurring opinion, defendants now carry the burden to show "the absence" of any price impact, acknowledging that "[t]he Court's judgment, therefore, should impose no heavy toll on securities-fraud plaintiffs with tenable claims." *Halliburton II*, 134 S. Ct. at 2417 (Ginsburg, J., concurring). Given the facts in this case – with representations and omissions about Genworth Australia and the IPO, which were critical to Genworth's viability, and a 25% one-day stock price drop when Defendants disclosed the truth – Defendants cannot make this showing.

Defendants' opposition will likely argue that they can carry their burden by selecting days where Genworth's stock price did not increase when an alleged misrepresentation or omission was made.   But as Judge Scheindlin held, "[t]he failure of an event study to find price movement does not prove lack of price impact with scientific certainty." *Barclays*, 310 F.R.D. at 86.   Accordingly, "[i]n the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it." *Id*.   In fact, courts in this District have followed the Supreme Court's directive and rejected this very type of price increase argument, recognizing that "[t]he failure of an event study to show immediate impoundment does not necessarily indicate whether the market is efficient for purposes of the *Basic* presumption." *Id*. at 85.   This is especially true where, like here, Lead Plaintiffs allege that Defendants' misrepresentations and omissions *maintained* the artificial inflation in Genworth securities.   For example, in *Barclays*, Judge Scheindlin certified a class and rejected defendants' argument that the event study conducted by plaintiffs' expert failed to show price impact on six dates on which alleged misstatements were made. *Id*. at 95.   Judge Scheindlin explained that "plaintiffs'

theory is that the false [statements] artificially maintained the stock price" and "the failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price." *Id.* And in *McIntire*, Judge Marrero granted class certification even where the company's stock price "decreased slightly" on the day of the alleged false statement. 38 F. Supp. 3d at 434. Judge Marrero rejected defendants' contention that the price decrease was sufficient to rebut the presumption, finding that "[a] material misstatement can impact a stock's value either by improperly causing the value to increase ***or*** by improperly maintaining the existing stock price." *Id.*[13]

As alleged in the Complaint upheld by this Court, the entire Class relied upon the accuracy and completeness of Defendants' statements, which artificially inflated and/or maintained the price of Genworth securities. Those allegations included that Defendants made "false statements of Genworth's income and assets that defendants purposefully and intentionally issued" throughout the Class Period. *See* Dkt. No. 53 at 1. These misrepresentations were disseminated to the investing public and reflected in the prices they paid for Genworth securities in an efficient market, *i.e.*, the NYSE. *See* Feinstein Decl., ¶¶60-61; *see also In re Sadia*, 269 F.R.D. 298, 309 (S.D.N.Y. 2010) ("[T]he NYSE [is] an open, well-developed and efficient market."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the [NYSE] is not an efficient market."); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) ("[I]f 'a

---

[13]    Even prior to *Halliburton II*, courts in this Circuit recognized that: (i) a material misstatement or omission can impact a security's value by improperly causing the security's price to increase ***or*** be maintained; and (ii) statements that affirm market expectations, like those made by Defendants here, would ***not*** be expected to cause a statistically significant price reaction. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011) ("hold[ing] that a statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value"); *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) ("[I]n 'a case about ***omissions***, . . . conducting event study analysis on the dates of the alleged omissions would not be probative [of price impact] and therefore, one would only look at the alleged corrective disclosure date.'") (emphasis in original). As the Supreme Court recognized in *Dura*, 544 U.S. at 347, the amount of inflation caused by false and misleading statements is properly calculated by the later price declines when the truth is revealed.

security is listed on the NYSE . . . the market for that security is presumed to be efficient.'"). Defendants cannot carry their heavy burden of providing direct evidence that "definitively demonstrate[s] lack of price impact." *Barclays*, 310 F.R.D. at 95.

**c.      Class Members Are Also Presumed to Rely on Defendants' Omissions Under *Affiliated Ute***

The Supreme Court's opinion in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), provides a separate, equally viable presumption of reliance for Plaintiffs and the Class for Defendants' omissions.  Under *Affiliated Ute*, where a plaintiff "'alleges omissions rather than affirmative misstatements, the element of reliance may be presumed if the omissions were material.'"  *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269 (S.D.N.Y. 2014) ("*Dodona II*"); *see also Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 185 (S.D.N.Y. 2005) ("*Fogarazzo I*") ("'[I]n securities fraud claims, reliance is presumed when the claim rests on the omission of a material fact.'"); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003) ("There is no burden to prove reliance on an omission.").

The existence of an alleged misrepresentation does not nullify the *Affiliated Ute* presumption. As Judge Marrero recognized in *Anwar v. Fairfield Greenwich Ltd.*:

> "the theory behind the Affiliated Ute presumption – that, when material information is concealed, plaintiffs should only have to prove that 'a reasonable investor might have considered the omitted facts important in the making of [her] investment decision' – is not undermined simply because a defendant makes misstatements at the same time it omits material information."

306 F.R.D. 134, 146 (S.D.N.Y. 2015) (quoting *Fogarazzo I*, 232 F.R.D. at 186); *Dodona II*, 296 F.R.D. at 270 (same).  Instead, the *Affiliated Ute* presumption applies "'"where plaintiffs' claims are based on a combination of omissions and misstatements,"'" and is limited only "where the omissions only 'exacerbate[] the misleading nature of the affirmative statements.'"  *Barclays*, 310 F.R.D. at 97.

- 24 -

In this case, Plaintiffs allege actionable omissions with respect to Genworth's SEC filings and conference call statements relating to Defendants' failure to disclose that the Australian MI unit was exposed to massive risk stemming from the high-risk low-documentation loans it insured in 2007 and 2008.  This risk quickly materialized during the Class Period in the form of a significant increase in delinquencies and claims, requiring increased reserves and eventually delaying the IPO.  *See* ¶¶89-108.  As in *Dodona II*, Plaintiffs' "claims 'sound in omission'" and "were material [because] 'the risks, associated with an investment are typically of primary concern for prospective investors.'"  296 F.R.D. at 269 (finding that the plaintiff "'ha[d] adequately alleged an actionable omission because, assuming it is right about the known risks, the risk disclosures in the Offering Circulars were inaccurate and therefore misleading'").  Accordingly, the presumption of reliance set forth in *Affiliated Ute* applies here.

### 2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

""""In general, securities suits such as this easily satisfy the superiority requirement of Rule 23."""  *JPMorgan*, 2015 U.S. Dist. LEXIS 132181, at *25.  As the Supreme Court explained:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."

*Amchem*, 521 U.S. at 617.  Here, not only do common questions predominate, but, as further required by Rule 23(b)(3), "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" based on consideration of the following factors:

> (A) the class members' interests in individually controlling the prosecution . . . of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members;

(C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

In this case, the Class members' interest in individually controlling the prosecution of separate actions is minimal because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive. Indeed, "[s]uperiority is readily found where, as here, 'the alternatives [to a class action] are either no recourse for thousands of stockholders . . . or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *36 (S.D.N.Y. Dec. 23, 2009). Unsurprisingly, Plaintiffs are not aware of any individual actions alleging this Class Period and these underlying facts that have been filed since this action was consolidated on July 25, 2014. *See Flag Telecom*, 245 F.R.D. at 172 ("[T]he prospect of investors filing separate actions is nightmarish, and we are unaware of any investors who have indicated a desire to do so.").

Additionally, the parties (and this Court) have an interest in this action proceeding in a single forum. Maintaining a consolidated class action ensures an efficient expenditure of resources and "will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses." *Id.*; *see also In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources"; and "[f]orcing each investor to litigate separately would also risk disparate results among those seeking redress."). Because Genworth conducts business throughout the United States, individual Class members are likely located in geographically dispersed areas. By certifying this action as a class action, the Court will avoid

inconsistent rulings, promoting the fair and efficient use of the judicial system.  The Southern District of New York is a desirable forum for this class action, especially since the securities at issue were traded on the NYSE.

Lead Plaintiffs do not foresee any significant difficulties that will likely be encountered in managing this case as a class action.  Lead Counsel and the Court have handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well established.  In addition, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties should they arise.  *See* Fed. R. Civ. P. 23(c), (d).  This action is appropriate for class treatment, embodying all of the hallmarks, both in form and substance, of the types of federal securities actions that are routinely certified in this Circuit and elsewhere.  *See, e.g.*, *Green*, 406 F.2d at 296 ("If, as here, the security in connection with which the alleged misrepresentations and violations of 10b-5 have been made is publicly held, a class action may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.").  Accordingly, certifying this action as a class action would not only be the superior method, but appears to be the ***sole method***, for fairly and efficiently litigating the claims of all members of the proposed Class.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (a) certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (b) certify Lead Plaintiffs as the

representatives of the proposed Class; and (c) appoint the law firms of Robbins Geller and Labaton Sucharow as Class Counsel.

DATED:  January 29, 2016

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DOUGLAS R. BRITTON
IVY T. NGO
ASHLEY M. PRICE

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
ingo@rgrdlaw.com
aprice@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

LABATON SUCHAROW LLP
JONATHAN GARDNER
ANGELINA NGUYEN
GUILLAUME BUELL
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jgardner@labaton.com
anguyen@labaton.com
gbuell@labaton.com

Lead Counsel for Plaintiffs

- 28 -

CYPEN & CYPEN
STEPHEN H. CYPEN
777 Arthur Godfrey Road, Suite 320
Miami Beach, FL  33140
Telephone 305/532-3200
305/535-0050 (fax)

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 29, 2016.

<u>  s/ DOUGLAS R. BRITTON                              </u>
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@rgrdlaw.com

## Mailing Information for a Case 1:14-cv-02392-AKH

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David Ira Ackerman**
  david.ackerman@dentons.com

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@rgrdlaw.com

- **Reid L. Ashinoff**
  reid.ashinoff@dentons.com,docketny@dentons.com

- **Douglas R. Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com

- **Guillaume Buell**
  gbuell@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com

- **Jonathan Gardner**
  jgardner@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com,agreenbaum@labaton.com

- **Patrick Joseph Gennardo**
  patrick.gennardo@dentons.com,docketny@dentons.com

- **Sandra Denise Hauser**
  sandra.hauser@dentons.com,shauser@sonnenschein.com,docketny@dentons.com

- **Justin Nessim Kattan**
  justin.kattan@dentons.com,jkattan@sonnenschein.com,docketny@dentons.com

- **Justine Noelle Margolis**
  justine.margolis@dentons.com,docketny@dentons.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Angelina Nguyen**
  anguyen@labaton.com,electroniccasefiling@labaton.com

- **William Stephen Norton**
  bnorton@motleyrice.com,mkimpson@motleyrice.com,kweil@motleyrice.com

- **Ashley M. Price**
  APrice@rgrdlaw.com,susanw@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,iveneck@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`